## Case No. 12,342.

The SARAH ANN.

[2 Sumn. 206.] [1]

Circuit Court, D. Massachusetts.   May Term, 1835.[2]

PLEADING IN ADMIRALTY — AMENDMENT — NEW FACTS — ALLEGATIONS — PROOFS — MARINE INSURANCE — ABANDONMENT — STALE DEMANDS——SALE BY MASTER.

1. In admiralty pleadings, the better practice is to present new facts, when necessary, by an amendment to the libel and answer, as in chancery. and not by way of replication and rejoinder.

2. The proofs and allegations must coincide. Proofs to facts not put in contestation by the pleadings, and allegations of facts not established by proofs, will both be rejected.
[Cited in The Morton, Case No. 9,864; The Aurania and The Republic, 29 Fed. 116.]

3. Appellate courts in admiralty allow parties, under certain circumstances, non allegata allegare, et non probata probare.

4. An abandonment once made is considered as a continuing abandonment, notwithstanding a refusal to accept it. unless it is withdrawn by the party offering it.

5. The master is the agent of all concerned in the voyage, and, whenever an abandonment has been accepted. becomes, by relation. the agent of the underwriters from the time of the loss, and a sale by him is then on account of the underwriters.

6. A valid sale may be made of personal goods, which are out of possession, and the sale will be of the thing itself, and not of a mere chose in action.
[Cited in Tome v. Dubois, 6 Wall. (73 U. S.) 554; Murphy v. Dunham, 38 Fed. 506.]
[Cited in Chapman v. Campbell, 13 Grat. (Va.) 111; Couillard v. Johnson. 24 Wis. 540; Dahill v. Booker, 140 Mass. 311, 5 N. E. 496; Meyers v. Briggs, 11 R. I. 182.]

7. If an owner stands by and knowingly suffers an innocent person to be misled by his silence. and to purchase his property without giving him notice of his title, a court of equity will treat it as a fraud upon the purchaser, and grant an injunction against the future assertion of that title by the owner.
[Cited in Baldwin v. Howell. 45 N. J. Eq. 532, 15 Atl. 236. Cited in brief in Haven v. Adams, 86 Mass. 86.]

[1] [Reported by Samuel Blatchford, Esq.]
[1] [Reported by Charles Sumner. Esq.]
[2] [Affirmed in 13 Pet. (38 U. S.) 387.]

8. Courts of admiralty, so far as their jurisdiction extends, administer it upon the principles of a court of equity, and not upon those of strict law.

9. Courts of admiralty, like courts of equity, govern themselves by the analogies of the common law limitations of actions, and, only under very strong circumstances, depart from them. Independently of any limitations, they will not entertain suits for stale demands.

[Cited in Jay v. Allen, Case No. 7,235; Packard v. The Louisa, Id. 10,652; Scull v. Raymond, 18 Fed. 553; Bailey v. Sundberg, 1 C. C. A. 387, 49 Fed. 586.] .

10. Where the acceptance of an abandonment occurred in October, 1828, (which related back to the loss in the preceding March,) and the libel was brought in September, 1834: *Held*, that, if the vessel had been within the reach of the process of this court for a reasonable time, to the knowledge of the libellants, after such a lapse of time, the libel ought not to be maintained.

[Cited in Cadmus v. Polhamus, Case No. 2,282a; Smith v. Sturgis, Id. 13,111; Southard v. Brady, 36 Fed. 561. Cited in brief in The Detroit, Case No. 3,832.]

[Cited in brief in Goddin v. Welton, 34 Mo. 454.]

11. It is not sufficient to justify a sale of a vessel by a master, that he acted in good faith, and in the exercise of his best discretion, unless there appears to have been an urgent necessity to sell for the preservation of the interests of all concerned.

[Cited in Copelin v. Phœnix Ins. Co., 46 Mo. 215; Duncan v. Reed, 39 Me. 418; Howland v. India Ins. Co., 131 Mass. 255. Cited in brief in Prince v. Ocean Ins. Co., 40 Me. 486.]

12. If an owner of reasonable prudence would have directed the sale from the opinion, that the vessel could not be delivered from the peril without the hazard of an expense, disproportionate to her real value, then the sale by the master must be deemed justifiable.

[Cited in The Lucinda Snow, Case No. 8,591; Fitz v. The Amelie, Id. 4,838.]

[Cited in Cox v. Foscue, 37 Ala. 505; Hundhausen v. U. S. Fire & Marine Ins. Co. (Tenn.) 17 S. W. 154; Mutual Safety Ins. Co. v. Cohen, 3 Gill, 471.]

13. In a case of urgent necessity, the master has a right to sell the vessel, as well on a home shore, as on a foreign shore, and whether the owner's residence be near or at a distance. It is otherwise, if the necessity be not urgent.

[Cited in Mutual Safety Ins. Co. v. Cohen, 3 Gill, 471.]

14. A sale by a master *held* valid, under the circumstances, and after a survey of the evidence, on the ground of urgent necessity.

[Cited in The Lucinda Snow, Case No. 8,591; Copeland v. Phœnix Ins. Co., Id. 3,210.]

15. Semble: If the court should decree a sale by the master invalid, where the transaction was clear from fraud, it would compel a proper allowance for the expenditures of the original purchasers in getting off and repairing the vessel.

[Cited in Mutual Safety Ins. Co. v. Cohen, 3 Gill, 471; Robertson v. Western M. & F. Ins. Co., 19 La. 227.]

[Cited in Pike v. Balch, 38 Me. 306.]

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a case of an appeal from a pro formâ decree of the district court, sitting in admiralty, dismissing the suit. [Case unreported.] The original libel was a proceeding in rem in the nature of a petitory suit in the admiralty, for the ascertainment and establishment of the title of the libellants (The New England Marine Insurance Company) to the proprietary interest of the brig Sarah Ann, and, as consequent thereon, for a decree for the possession of the vessel. It appeared from the proceedings and proofs in the cause, that the libellants, on the first day of March, 1828, at Boston, underwrote a policy of insurance upon the brig valued at $4,000, in port and at sea, during the term of one year, from the 22d of February, 1828; and while the policy was in full force, to wit, on the 25th of March, 1828, the brig was stranded on the shore of the island of Nantucket, in the state of Massachusetts; and on the succeeding day an abandonment was made by the owners to the libellants, for a total loss by the perils of the sea. The abandonment was not, however, at that time accepted by the libellants; but was expressly refused. It was not, however, withdrawn by the owners; and finally, on the third day of October, 1828, a compromise took place between the owners and the libellants, by which all the right and title of the owners in the brig was assigned to the libellants. This constituted the title set up by the libellants. The claimants [Obadiah Woodbury and others] did not deny these facts; but they asserted a title to the brig (as intermediate purchasers), derived under a sale made by the master after the stranding, upon the ground of an alleged necessity; and no question was made as to the regular derivation of their title, if the sale of the master was justifiable in point of law, under all the circumstances.

S. Hubbard, for libellants.
C. P. Curtis, for claimants.

STORY, Circuit Justice. I regret, that the pleadings in this case do not present all the points made in argument in a clear and definite form. The old course of practice, indeed, was to introduce additional matters by way of replication and rejoinder; but the modern and certainly the better practice, is to present new facts, when rendered necessary, in an amendment of the libel and answer, as is the ordinary course in chancery. There is, too, a want of certainty and precision in some of the allegations on both sides, which is somewhat embarrassing; for, although the admiralty proceedings do not partake of the severe strictness of the common law, they do not yet require, that all material facts should be stated with convenient certainty as to times, and facts, especially when they are the turning points of the cause. However, as no exceptions on this head have been taken at the hearing, they must be deemed to be waived by the parties, though not without inconvenience to the court.

The principal, though not the sole question, arising in the case is, whether the sale was under all the circumstances a valid sale. Be-

fore, however, proceeding to the consideration of this question, it may be well to dispose of some minor objections, which are taken to the title of the libellants. In the first place, it is said, that the title of the libellants, under the abandonment, cannot be maintained, because it was not accepted at the time when the sale was made by the master; but it was at that time utterly rejected; and that the subsequent title under the assignment, not being propounded in the pleadings, is not matter properly in contestation in the suit; for the cause must stand before the court to be heard, secundum allegata et probata. It is certainly true, that the proofs and the allegations must coincide; for if there be proofs to facts not put in contestation by the pleadings, or allegations of facts not established by proofs, in each case they must be rejected. But, as I understand the posture of the present case before the court, the assignment is not now offered as a substantive proof of the creation of an original title, but merely as proof of the final acceptance of the title by abandonment under a compromise; and if so, then, by the final acceptance of the abandonment, the title of the libellants relates back to the time of the loss, and takes effect, retroactively from that period. An abandonment once made is considered as a continuing abandonment, notwithstanding a refusal to accept it, unless it is withdrawn by the party offering it. But this is the less necessary to be minutely sifted, because this court could, by allowing an amendment of the libel, bring the matter properly before it, since it is a well known rule of the appellate courts in admiralty causes to allow the parties non allegata allegare et non probata probare, under some qualifications not here necessary to be mentioned.

Then, it is said, that as the sale was made before the abandonment was accepted, it was a sale made by the master, as agent of the owners; and, that by implication the abandonment admits the necessity of the sale, and adopts and justifies it. But here, again, I cannot admit the entire correctness of the argument. When a loss takes place, for which an abandonment may be made, the master is not exclusively the agent of the original owners of the ship; but he is the agent of those, who retroactively become owners of the ship, in consequence of that event, if an abandonment is made, and is justifiable. The common doctrine is, that the master is the agent of all concerned in the voyage; and, that he becomes, by relation, the agent of the underwriters, whenever an abandonment has been accepted, from the time of the loss, to which that abandonment refers, although the abandonment may not have been offered or accepted, until months after the event. So that in the present case, if the libellants have finally accepted the abandonment, and it was persisted in by the owners, and never withdrawn by them, but was a continuing abandonment on their side, the act of the master in the sale is to be treated as his act, as agent of the libellants,

and not of the original owners. Now, there is not a scintilla of proof in the case to establish the fact, that the original owners ever withdrew their abandonment, or that it was ever contemplated by the parties, that the assignment in October, 1828, should take effect as a new and substantive title, independently of the abandonment. There is this additional consideration, which ought not to be forgotten; and it is, that the sale of a ship by an owner, out of possession, is not the sale of a chose in action. I know of no principle of law, that establishes, that a sale of personal goods is invalid, because they are not in the possession of the rightful owner; but are withheld by a wrong doer. The sale is not, under such circumstances, the sale of a right of action; but it is the sale of the thing itself, and good to pass the title against every person, not holding the same under a bona fide title, for a valuable consideration without notice; and â fortiori against a wrong-doer.

Then, again it is suggested, that after the sale, the brig was gotten off, and was repaired and came to Boston; and was there sold, and a register afterwards taken out in the name of the purchasers, without any objection on the part of the libellants, although they had full knowledge of the facts; and consequently their conduct amounted to a waiver of all claim against the vessel, at least against bona fide purchasers. And especial reliance is placed on the letter of the libellants to the agent of the original owners, dated the 14th of May, 1828, in which they express their determination to refuse the abandonment, and state that the brig is then in Boston; and then add: "As she is now within your own control, as agent for the owner, if you do not take possession of her in his (their) behalf, the company must consider the sale of her at Nantucket, as affirmed by him (them), and that she is sold for his (their) account. We, of course, shall contest the validity of the sale, as it regards ourselves; and we think, the owners ought to contest it themselves."

Now, I agree to the doctrine stated at the bar, that if an owner stands by, and knowingly suffers an innocent person, without giving him notice of his title, to purchase his property, and to be misled by his silence in not asserting that title, a court of equity will treat it as a fraud upon the purchaser, and grant an injunction against the positive assertion of that title. And I also agree, that a court of admiralty, so far as it possesses jurisdiction, does administer it upon the principles, not of strict law, but upon the principles adopted by courts of equity. And, if this case stood upon proofs of this sort, going directly to the point, I should not hesitate to say, that for this ground alone the court would be bound to dismiss the libel. But the facts of the present case, present a clear distinction. At the time when the transactions in Boston took place, the title was in contest between the original owners, and the

underwriters. The latter did not claim or assert any title, but denied the abandonment to be good. And on the contrary, the original owners insisted, that the abandonment was good. So that neither party was in a situation to assert a title, without compromitting rights then actually in contestation. And it was, therefore, under such circumstances the duty of the purchaser to look to his title-deeds, and to satisfy himself by all due inquiries of the true nature and validity of his title; for the maxim of law, caveat emptor, strictly applied to him. So far, indeed, were the libellants from acquiescing in, or countenancing this sale, that the letter of the 14th of May expressly establishes their determination to contest it. Then, as to the lapse of time, which is relied on as another point of objection to the maintenance of the present libel. The abandonment was in March, 1828; and the final acceptance of it, if at all, was in October of the same year. The present libel was filed in September, 1834, after the lapse of nearly six years. Now, courts of admiralty, like courts of equity, govern themselves in the maintenance of suits by the analogies of the common law limitations; and are not inclined, unless under very strong circumstances, to depart from those limitations. But, independently of any statutable limitations, courts of admiralty will not entertain suits for stale demands. The party, who seeks redress there, must come within a reasonable time, or the court will not incline to exert its powers actively in his behalf. And if there were suitable allegations and proofs in this cause, that, after the final acceptance of this abandonment in October, 1828 (which, as we have seen, must relate back to the loss in the preceding March,) the brig had been within the ports of Massachusetts, and within the reach of the process of this court, for a reasonable time, to the knowledge of the libellants, I should much incline to the opinion, that after such a lapse of time the libel ought not to be maintained. But no such allegations and proofs are brought forward, so as to justify the court in such a proceeding.

We are, then, driven to the consideration of the question already suggested, whether the sale made by the master was, under all the circumstances, justified by necessity. If it was, the title of the claimants is unexceptionable. If it was not, then it seems to me, that the libellants are entitled to a decree for possession upon their title under the abandonment. The facts, as stated in the protest, are as follows: The brig, having on board a cargo of rice and cotton, sailed on a voyage from Savannah for Boston, and, on the 23d of March, 1828, was stranded on the south-west side of the island of Nantucket. On the next day, assistance was obtained from the shore, and the anchors were got out and hove tight, in order to start the vessel, but without success. In the course of the forenoon, the wreck-master came on board with twenty men, and pursuant to his directions, the deck-load was thrown overboard. They then hove on the cables again, but with no beneficial effect. They then proceeded to open the hatches, and discharge the cargo from the hold; and then hove on the cables again, but to no purpose, as the tide had fallen, and there was a considerable surf rolling in shore. The captain and crew remained on board that night; and the day following nothing could be done, as the wind blew strong at the south-east, and there was a heavy surf. After the weather moderated, the cargo was, with much difficulty, got on shore. The wind and the surf of the sea had driven the brig so far on shore, as to render it impossible to get her off. Such is the statement of the protest, which, in many of the important particulars, is corroborated by the other evidence in the case. It further appears from the evidence, that the place, where the brig was stranded, was a sandy beach, about twelve miles distance by sea and six miles by land from the town of Nantucket, and that she was at no time high and dry there. The depth of water about her varied; sometimes it was ten feet, and sometimes six feet; and she was no time of the tide out of water. The cargo was discharged in about five days; and the spars, sails and rigging were then stripped off and carried on shore, and sold in small lots to the highest bidders. After the cargo was discharged, the brig became loose in the sand, and slewed round, and lay with her broadside to the shore. She was sold on the 28th day of March, by the master, at public auction, where she lay, for $127, at the same time that the spars, sails, and rigging were sold. The latter brought $422.40. No efforts appear to have been made after the brig was unladen, to get off from the shore, though she had not then sustained any serious injury. Three intelligent surveyors, at a subsequent period, estimated the cost of repairs of her hull as not exceeding the sum of $492.25. The brig was gotten off by the purchasers soon after the sale, and was carried to the port of Nantucket, and there repaired. The whole cost of the brig to the purchasers, including her repairs, and outfits to Boston, is represented to have been $2,494.67; and she was actually sold, under their orders, at Boston, in July, 1828, for the net sum of $2,736.41.

Such being the general outline of the facts in evidence, the question is, whether, connecting these facts with the opinions of the witnesses given in the case, the necessity of the sale is clearly made out. I agree at once to the doctrine, that it is not sufficient to show, that the master acted with good faith, and in the exercise of his best discretion. The claimants (upon whom the onus probandi of the validity of the sale is thrown) must go farther, and prove that there was a moral necessity for the sale, so as to make it an urgent duty upon the master to sell for the preservation of the interest of all concerned. And I do not well

know how to put the case more clearly than by stating, that if the circumstances were such, that an owner of reasonable prudence and discretion, acting upon the pressure of the occasion, would have directed the sale from a firm opinion, that the brig could not be delivered from the peril at all, or not without the hazard of an expense utterly disproportionate to her real value, as she lay on the beach, then the sale by the master was justifiable, and must be deemed to have been made under a moral necessity. And this I consider the true doctrine deducible from the case of Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 249, where the subject is examined very much at large and with great ability.

It has been suggested at the argument, that as the stranding was on a home shore, at no great distance from the residence of the agent of the owners, the master was not authorized to sell without consulting the agent or the owners. I agree at once to the position, if there is no urgent necessity for the sale. But if such an urgent necessity does exist, as renders every delay highly perilous. or ruinous to the interests of all concerned, the duty of the master is the same, whether the vessel be stranded on the home shore or on a foreign shore, whether the owners' residence be near, or be at a distance. I am aware of the doctrine maintained by my brother. the late Mr. Justice Washington, in Scull v. Briddle [Case No. 12,569]; and, unless it is to be received with the qualification above stated, I cannot assent to it. The fact, that the brig was actually gotten off by the purchasers after the sale, is certainly a strong circumstance against the necessity of the sale. But it is by no means decisive; for we are not, in cases of this sort, to judge by the event; for a vessel may be apparently in a desperate situation, and yet by some lucky accident, or unexpected concurrence of fortunate circumstances, she may be delivered from her peril. We must look to the state of things, as it was at the time of the sale; and weigh all the circumstances; the position and exposure of the brig; season of the year; the dangers from storms; the expense of any attempts to get her off; the probable chances of success; and the necessity of immediate action on the part of the master, one way or the other.

As to the position of the brig, there is abundant evidence, that it was truly perilous. She was on an open shore of shifting sand, exposed to the constant action of the surf, and in case of a storm, to the full fury of the wind and sea. Indeed, the testimony is exceedingly strong, and I had almost said, conclusive, that if a southerly storm had occurred after the sale, and before the brig was gotten off, she would have gone to pieces. One did occur, a few hours after she was gotten off, which several of the witnesses think would have been fatal to her, if she had been on the shore. The probability of a storm, at that season of the year, upon our coast, is too well known to require any comment. It is the very season

of blustering and variable weather, which has rendered the vernal equinox proverbial for its dangers and uncertainties. Some unsuccessful efforts had been already made to get the brig off; and a storm, which had already taken place, had driven her higher up, and broadside to the shore, and of course had placed her, being constantly in the surf, in a more hazardous situation. Considerable expense would necessarily be incurred in any new attempts to get her off, because the cables and anchors, and purchases used on a former occasion had been left in the surf, and could not be regained; and if the probability of success was small, this very expense would be a dead loss to all concerned. If a storm should, in the mean time, take place, a total wreck would be almost inevitable. We find, too, from the evidence, that, of all the vessels stranded upon the shore of Nantucket, a very small proportion have ever been gotten off. A list of such vessels is appended to the evidence, which establishes this fact beyond controversy. One of the witnesses (a very experienced merchant and wreck-master) says, that there has not been a brig or ship got off from the south and west seaboard of the island of Nantucket for twenty years before the Sarah Ann, except the brig Pearl.

The circumstances, attending the sale, are also fit to be brought under review. Full public notice appears to have been given; and a large company attended. The sale appears to have been fairly and freely conducted; and no combination is suggested to affect the biddings, or to produce a sacrifice of the property. Several of the witnesses testify, that they went there to bid for the vessel; but that she was sold for a price beyond what they thought her worth, or they were willing to give. Now, certainly, under such circumstances. a sale in the immediate neighborhood of a populous and flourishing seaport of great intelligence and enterprise. for so small a sum as about $549 for the hull, spars. sails. and rigging, does indicate a very strong opinion in those present, that the chances of saving the brig were few, and her situation was eminently perilous. The hull, rigging. and other appurtenances sold for a sum less than one-seventh of the valuation in the policy of insurance. The necessary repairs to put the brig in order. if she should be gotten off. are admitted to be properly estimated at $492. To these must be added. the expenses for the rigging. &c., estimated at about $444, and of getting off the brig estimated at about $1.205. making in the whole an outlay, by the purchasers. according to their estimate, of about $2.690. a sum sufficiently startling to be given for a stranded vessel. valued at $4.000 in the policy. and in all probability a very high valuation. and then in a state of peril. from which it was uncertain. whether she could ever be delivered.

It is said. that some of these charges and expenditures are over-estimated and imaginary. But the clerk of one of the purchasers, who settled the accounts, swears, that the whole

cost of the brig, including the expense of getting her off, and repairing her and her outfits, amounted to $2,494 73; and that the purchasers settled the account between themselves, and adjusted the balance upon the footing of that amount. Even if we were to strike off one fifth part from this amount for any supposed over-estimate, it would still appear, that an expenditure equal to one half of her valuation was indispensable to restore her to her former state. But to this in all fairness must be added the positive risk of a total loss of the brig upon the shore. In point of fact, the brig was afterwards (as we have seen) sold at Boston for $2,736, so that even in the successful events, which were anticipated, she brought little more than an indemnity to the purchasers.

In regard to the opinions of the witnesses, that the brig was capable of being gotten off, and that farther efforts ought to have been made for that purpose, there is the testimony of Mr. North, who assisted in discharging her, who speaks pointedly and affirmatively on the subject. He was on the spot, and doubtless he is on that account a witness of peculiar competency. The mate and one of the seamen, of the brig, also speak to the same point with equal decision. But their testimony is of less weight, because they were unacquainted with the shore, never having been at Nantucket before or since that occasion. Capt. Adams, also, who was the agent of the underwriters, expresses a similar opinion. But as he was not present, while the brig was ashore, and as he had never been at Nantucket at any other time, his testimony certainly is not so stringent, as it otherwise would be. But, what is most material in the consideration of this testimony is, that so far as it respects getting off the brig, it proceeds upon the supposition, that the weather should continue favorable, and no storm should occur.

If the case were to be decided by this testimony alone, I confess, that I should incline to listen to it with great confidence in its accuracy. But it is encountered by very strong testimony on the other side, coming from numerous witnesses, inhabitants of the island, who are well acquinted with the shore, and with the situation of the brig. They express a very decided opinion, that the conduct of the master in directing the sale was prudent and proper under the circumstances; that the brig was in a perilous situation, with little chance of being gotten off; and in case of a storm, with almost a certainty of going to pieces; that the brig was sold for as much as she was worth in her then situation, and for more than some of them were willing to give. And this, in an especial manner, in the opinion of the wreck-master, who went on board in the morning after the stranding, and continued to assist in all the operations, until the sale was completed; and his judgment must have had great weight with the master in all that he did,

and all that he left undone. Under such circumstances, as a man of great experience, and a public officer, and entirely disinterested, I cannot but place great confidence in his judgment. He had peculiar means of forming a correct judgment, not only from his intimate knowledge of the coast, and the disasters thereon, but from his having been often employed as an agent in cases of wrecked vessels. He is fully confirmed in all his statements by another witness, who has also acted as a wreck-master and agent for a considerable number of years, and assisted in all the arrangements made in the case of the Sarah Ann, who says, "that if the brig had not gone off in two days more, in my opinion she would have been all in pieces. Where she lay was a sandy bank and bars without her. The sand was continually shifting around the wreck by the heave of the sea."

Now, when this testimony is connected with other established facts in the case, and especially with the season of the year, the imminent danger from any succeeding storms, the rareness of any successful efforts to get off any large vessels stranded on that shore; and the actual expenditure of a sum, fully equal to one half or more of the value of the brig, in order to refit her, and bring her to a suitable market for sale, it does seem to me difficult to resist the impression, that there was in the present case a moral necessity imposed upon the master to sell. I do not say, that the case is beyond all doubt; but it appears to me established by a weight of testimony and circumstances, which I am not at liberty to resist.

I feel the less difficulty in having arrived at this conclusion, because if I had felt it my duty to decree possession to the libellants, grounded upon the invalidity of the sale, the decree must have been upon the terms of making all due allowances to the claimants, for the expenditures of the original purchasers in getting off the vessel and repairing her. This is the case of a clear bona fide purchase, under circumstances calling for no inconsiderable indulgence, even if the strict law had been against the title. The general practice of the admiralty in all such cases is, to restore possession upon making compensation for all meliorations by the purchaser. See The Perseverance, 2 C. Rob. Adm. 239; Nostra de Conceicas, 5 C. Rob. Adm. 294. It is an equitable principle, analogous to that, which is constantly acted upon in courts of equity, and probably borrowed from the same common source, the civil law. And if meliorations ought to be decreed generally, a fortiori, the actual disbursements and expenses ought to be allowed, which were incurred to deliver the vessel from her peril; for they are in the nature of salvage. Where, indeed, the title is not only invalid, but the transaction is tainted with fraud or ill faith (which is not pretended in the present case), the rule would be different.

Upon the whole, my opinion is, that the decree of the district court, dismissing the libel, must be affirmed with costs.

[On appeal to the supreme court, the decree of this court was affirmed. 13 Pet. (38 U. S.) 387.]