HON. EDWARD C. FITZHUGH...................... DO     DO

RICHARD LANE.................................. CLERK.

## PRICE, GREEN & Co. *vs.* FRANKEL & LIGHTNER.

Materialmen have no lien upon a domestic vessel, in her home port, or that in which the owner resides. Peculiar circumstances, such as are mentioned in the opinion, may qualify this rule.

The common law, not favoring liens, deems surrender of possession, a waiver of lien.

The statute of California, providing liabilities against vessels for supplies and materials furnished, within that state, creates no lien upon vessels, until proceedings are instituted to enforce the liability as contemplated by that statute. There being no such lien created in this case, this Court sitting in admiralty can exercise no jurisdiction.

Courts of admiralty proceeding *in rem*, sometimes recognize, and enforce equitable claims of a maritime character, although of themselves not actual causes of maritime lien, where the claims are properly related to the subject and the parties before the Court.

The item in this case, for brokerage, factorage, and other similar claims, is a charge for which the ship is liable, and should be paid out of the funds in Court.

APPEAL from the Second Judicial District, holding terms at Olympia.

Opinion by McFADDEN, Chief Justice.

This cause comes before the Court on an appeal from the decree of the District Court, sitting in Admiralty. The steamship *Constitution* was libelled on bottomry bond, a decree of

---

*Strong, Justice, having been of counsel in the Court below, took no part in the decision of this case.

5

condemnation passed, and she was sold to satisfy the claim.  A balance of the fund arising from the sale, was paid into and remains in Court to satisfy the claims of contesting parties.  The respondents, Frankel & Lightner, were owners of the ship at the time of the decree of condemnation and sale, and claim the residium or remnant, being the funds in Court, as against the appellants, who claim to intervene, under the following circumstances:

The said steamship *Constitution* was undergoing repairs at the port of Benicia, in the state of California.  The appellants, Price, Green & Co., were merchants, doing business and residing in the city of San Francisco, and on the application of James M. Hunt, master of the said steamer *Constitution*, and of Hunt and John H. Scranton, advanced moneys from time to time to the said Hunt, and the said Hunt and Scranton, which it is alleged were applied to the payment of materialmen and mechanics engaged in the repairs of said ship, and in purchasing supplies to fit her for the sea.

The said ship *Constitution*, subsequently, 8th July, 1857, left the ports of California, destined for the waters of Puget Sound, within the jurisdiction of Washington Territory.  The ship, after leaving the ports of California, encountered heavy seas, sprung a leak, and after a "jettison," was compelled to seek refuge in the port of San Francisco, which she reached with great difficulty, and in a sinking condition.

Additional expenses were again necessarily incurred, in the shape of port charges, and charges resulting from the adjustment of general average, which constitute one of the items in the appellants' bill.  The ship, on her second departure from the port of San Francisco, reached the waters of Puget Sound, which she continued to navigate, up to the time of the decree of condemnation.

The appellants, Price, Green & Co., claim to have the following bill satisfied out of the surplus funds in Court, viz: Four thousand six hundred and nine dollars and ten one-hundredths, ($4,609.10.)

This bill is composed of sundry items for moneys disbursed and charges made, for and on account of the steamship *Constitution*. And that they are entitled to the decree of this Court awarding the said remnant to them, or so much thereof as may be necessary to liquidate the claim.

In the argument of this case, the counsel, on both sides, have argued this case with great ability, and have exhibited a research in the discussion of the many important legal questions which arise at the different stages in this cause, rarely surpassed in the judicial tribunals of the country; principles novel and important, and underlying the whole range of admiralty jurisdiction and practice.

This discussion was necessary from the difficulty which surrounded the facts of the case, and notwithstanding the lucid arguments of counsel on the questions of law, on the facts involved, we are free to admit that we are in doubt, and hesitate as to the conclusion which should be arrived at, in order to do justice to all of the parties concerned.

In proof of ownership, we have the agreement of James M. Hunt, entered into with H. W. Davidge, president of the P. M. S. S. Co., bearing date New York, March 20, 1857, which, on examination, proves to be an executory contract; yet there is nothing to show that this contract was ever consummated by a transfer of the possession of the ship, or the payment of the balance of the purchase money. J. H. Scranton states explicitly that the contract was not completed, but that if the ship had been transferred to Hunt, under this agreement, he would have been equal owner with Hunt. As to who was really the equitable owner there is great difficulty in ascertaining.

In reference to the equitable ownership of this vessel at the time when the liabilities were incurred, there is a something hidden—a something unseen and shrouded in a darkness so impenetrable that it is with the greatest difficulty we are able to cast aside the veil which conceals this part of the case.

Forbes, one of the Pacific M. S. S. Co., in his deposition, states that the agents, whose office and place of business were in

San Francisco, and generally known to the citizens, "had the control, possession, and management of the ships of said Company, *except the Constitution.*"

The decree of the District Court of San Francisco, shows that the legal title was in Ebenezer Knight, and the equitable title was in the P. M. S. S. Co.; that on the first day of September, A. D. 1851, Knight, as agent, *and in trust*, for the said P. M. S. S. Co., became the legal owner of said steamship *Constitution;* that from the time he became owner, the said ship, up to the 30th day of June, 1857, was in the possession, under the exclusive control, and in the use and employment of said P. M. S. S. Co., and of its agents and servants, as the property of the said Company.

On the 6th day of July, A. D. 1857, Carlisle Patterson, administrator of the estate of E. Knight, deceased, conveyed the legal title to the said ship *Constitution*, to the P. M. S. S. Co., in pursuance of the decree of the District Court aforesaid. Mensesheimer & Lightner, by bill of sale made by the P. M. S. S. Co., became the legal owners, on the 8th day of July, 1857, and in the execution of the bottomry bond to C. A. Low, dated 15th day of August, A. D. 1857, Lightner & Mensesheimer executed the same, as owners, and James M. Hunt as master and commander, which most conclusively repels the presumption attempted to be raised by the appellants' counsel, that Hunt was the owner, and that in the double capacity of owner and master, he departed the ports of California, in the said steamship *Constitution*. Mensesheimer & Lightner, by this bill of sale, became the legal owners, on the 8th day of July, 1857.

J. H. Scranton deposes that the repairs were mostly made while the ship was in the hands of Knight, and that if she had been transferred to Hunt, he would have been an equal owner. It is patent that these repairs were not put upon this ship for the benefit of the P. M. S. S. Co., for if she had been transferred to Hunt under the agreement with Davidge, the Company had taken the precaution to guard against responsibility from that quarter.

As the Davidge contract was not completed, and no transfer of the ship to Hunt, under that agreement, the repairs could not have been for the benefit of Hunt. *Who, then, was the owner, from May up to July 8th,* 1857? That the legal title was in Knight, who held in trust for certain purposes, there can be no question. The transfer of the legal title was made by the P. M. S. S. Co. to Mensesheimer & Lightner, July 8th, 1857.

All the circumstances point to the fact that this was but the consummation of a prior existing contract on the part of these parties with the P. M. S. S. Co. This being the case, they were the parties who were interested in having the vessel fitted for the seas, and the only parties who had any interest in the subject. Seeking, as we are compelled to do, amidst a mass of contradictory testimony, for a basis upon which to found our rulings in this case, we have sought with patient diligence, and most dispassionately for the legitimate conclusions of fact established by the testimony.

The conclusion which has forced itself upon our minds is, that Mensesheimer & Lightner were the equitable owners of the steamship *Constitution*, during the time when these liabilities were incurred. It is necessary, therefore, that the residence of Mensesheimer & Lightner should be determined by the facts of the case, for the purpose of fixing the character of this vessel, either as a foreign or domestic ship. So far as ownership goes, upon this subject, there is but little testimony, and that not entirely free from conflict.

W. R. Wadsworth states, that he knew the parties from the latter part of June, 1857; that Mensesheimer resided in San Francisco—sometimes absent—and believes that it was in September, or the first part of October, that he left. He says Isaac Lightner has resided here (San Francisco) from the period he became acquainted with him until the 8th day of July, 1857, on which day he left in the steamer *Constitution;* returned on the *Constitution* after the jettison, and in August following, left by steamer for Washington Territory, where he believes he has since resided.

For the purpose of repelling any presumption which might be raised by this testimony, as to the residence of Mensesheimer & Lightner, the testimony of A. J. Moses is offered, to show that after the legal title to this vessel passed to Mensesheimer & Lightner, that Lightner made, or came into Court for the purpose of making his application for naturalization. Under what circumstances this application was made, whether to supply the loss of papers, or for other reasons, does not appear. In opposition to this, we have the oath of Lightner, as to the fact of his citizenship. In this, we think there is nothing affecting his rights as a citizen.

Some testimony was offered to show that Mensesheimer was in his minority, and as to residence; but we think there was nothing in this qualifying his residence, and as to the question of age, even if his minority had been satisfactorily established, a Court of equity would not permit it to be used to his prejudice.

That Mensesheimer was a resident and citizen of California at the time referred to, we are satisfied, and that Lightner was also resident and citizen of the same place, would also seem to be the fact from the testimony; and if the testimony of Wadsworth was incorrect, the contrary could have been easily shown, but, in any event, the residence of Mensesheimer has been satisfactorily established.

We are, therefore, forced to the conclusion that the steamship *Constitution* was essentially a domestic vessel, during the time when these liabilities were incurred.

That there can be no lien set up by material-men, or for repairs or supplies, in the case of a domestic vessel, in the home port, or the port in which one or more of the owners reside, except the common law lien, has been so conclusively settled by Judicial decree in the Courts of the United States, that it is no longer a mooted question. The authorities upon this point are numerous, and it is only necessary to refer to the following: *Jane vs. brig President*, 4 W. C. C. R. 453; the *Nestor*, 1 Sumner, 73; the *Robert Fulton*, 1 Paine, 620.

That this rule may be qualified by particular circumstances, such as assuming or representing the ship to be a foreign ship, the owner standing by with sealed lips, when he has reason to believe the material-men and others are looking to the ship for remuneration; or the right as against the owner to come into the admiralty upon a surplus fund, are qualifications which at this stage of the case is not necessary for us to discuss.

The principles of the common law are adverse to liens, and more especially liens of a secret and intangible character. We do not know that they have ever been held to extend beyond the right of the party in possession of the *rem* to retain the same until his claim is satisfied. A surrender of the possession has ever been held a relinquishment of the lien. The lien at the common law is tangible—in admiralty, secret and intangible in its character, and it is only for the benefit of commerce that a liberal operation has been given to the maritime lien.

In this case the appellants claim to recover not only under the general principles of admiralty law, but that they are entitled to the fund by virtue of a lien given them by the local law of California; and that where liens of a maritime character are given by the local law, they will, on application to the courts of admiralty, be recognized and enforced in a proceeding *in rem.* Where the lien is given by the local law, for causes partaking of a maritime character, although not constituting actual causes of maritime lien, which would be enforced under the general laws of admiralty, the District Courts of the United States, sitting in admiralty, have frequently taken cognizance of, and enforced by admiralty process, the lien given by the local law; and this would seem to be in consonance with the rules established by the Supreme Court. *Vide* rule 12, practice of the United States Courts, by Law, page 542; the *Gen. Smith,* 4 Wheaton, 438; *Pegraux vs. Howard,* 7 Peters, 324; the *Jerusalem,* 2 Gall, 345; the *Fulton,* 1 Paine, 620; *a new brig,* Gilpin, 473.

In the application of the local law of California, two questions are presented for our consideration:

1. Does the local law of California give a lien upon a do-

mestic vessel, in the ports of that state, for materials, mechanical services, or supplies furnished a ship undergoing repairs in the home port, or port where the owner resides, on the application of the master?

2. The extra territorial effect or operation of a local law?

In the discussion of the first proposition, it is necessary that we should examine the legislation of California, for by the terms of the statute, and the general policy of the law, must this question be determined. The local law of California, Wood's Digest, article 1051, sec. 317, page 207, provides that all steamers, vessels and boats, shall be liable for supplies furnished for their use, at the request of their respective owners, masters, agents or consignees, for services rendered on board, at the request of, or on contract with their respective owners, masters, agents or consignees, for material furnished in their construction or repair or equipment—for their wharfage and anchorage, within the state; for non-performance or mal-performance of any contract for the transportation of persons or property made by their respective owners, masters, agents or consignees; for injuries committed by them to persons or property; provided that the wages of mariners, boatmen, and others employed in the service of such steamers, vessels and boats, shall have preference of all other demands.

Subsequent sections of the act provide that proceedings may be directed against the vessel by name. The proceedings must be by summons, in conjunction with which, or subsequently, an attachment may issue, and the vessel, tackle, and furniture be held as security for any judgment which may be obtained. The summons to be served on the master, mate, or any person having charge of the same. In case the attachment has not been discharged, and a judgment has been recovered, the sheriff is to sell the vessel, tackle, and furniture, or such interest therein as may be necessary, and apply the proceeds of the sale, first, to the claims of mariners, boatmen, and other persons employed in the service of the vessel, then to the satisfaction of the judgment, costs and sheriff's fees, and the balance to the

owner, agent or consignee, or in default of appearance by any of these parties, to be deposited in the Court.

Local laws have frequently been enacted by the legislature, for the control of property belonging to the state, and for the better protection of the interest of the citizens of the state, and such legislation in many cases is doubtless to be commended, as furnishing to the citizen a speedy and summary remedy for the enforcement of his rights and the prevention of frauds.

The causes of action provided by this statute, are numerous and comprehensive, extending not only to causes *ex contractu*, but to causes *ex delicto*.

The practical effect and operation of such statutes have been frequently mooted in the district courts of the United States, some of which have been regarded with favor, others, as we shall see, with disapprobation.

In the states of New York, Maine, and Pennsylvania, local laws exist creating liens in favor of material-men and mechanics upon domestic vessels. In the statutes of New York and Maine, the lien is expressly conferred.  By the statute of Pennsylvania, it is enacted "that ships and vessels of all kinds, built, repaired and fitted within this state, are hereby declared to be liable and chargeable for all debts contracted," etc., and which is continued until they sail, or leave port, and such debts must be first paid.  *Davis vs. a new brig*, Gilpin, pages 473, 487; *Harper vs. a new brig*, *ibid*, 536, 1 Conkl. Admr., pages 63 and 64.

A reference to the statute of California proves it to be more general than any of the foregoing.  It will be observed that, neither the term *lien*, nor a term of like import as *chargeable*, occurs in the statute.  The distinction between the terms "liability," and "lien," are very material.  The real and personal estate of debtors in perhaps every state of the Union are liable for the payment of debts, yet, in the one case, in a judgment, in the other, until a levy, no lien is known or recognized by the law.

This law of California creates a liability on the part of vessels to suits for the demands therein stated, and the only limit,

as to time, so far as we can see, is three years, under the general statute of limitation.   Wood's Digest, page 47, article 17.

No provision is made in the statute by which a party exercising ordinary prudence in the purchase of vessels within the ports of California, can by possibility guard against state claims following the vessel, in the hands of an innocent vendee, into the waters of a sister state or territory, at any time within three years.

As already remarked, it is well enough for the legislature of California to protect the citizens of her own state, in their just rights, but if she expects recognition of such laws by the courts of a sister state or territory, they must be such as cannot be worked to the destruction of the rights and interests of the citizens of that sister state or territory.   Comity should be mutual.

Here, as we have seen, liabilities created by this statute, whether arising *ex contractu* or *ex delicto*, may encumber the property in this Territory for years, and work irreparable injury to our citizens.   We can see nothing in this act which would lead us to believe that the legislature of California ever intended this statute to have such an effect.

We are satisfied the statute of California creates no lien which would give a claimant under it the right to proceed *in rem* in the admiralty, but that the first lien or security created or allowed, is upon the service of the attachment, or in any view of the case as ruled by the Supreme Court of California, "only when service is had in the suit—and that it was not the intention of the legislature to make the lien attach when the liability was incurred."   *Fisher vs. White et al.*, 8 vol. Cal. R., page 418.

In the District Court of the United States, for the District of Wisconsin, in the case of *Putney against sloop Celestine*, American Law Journal for 1857, new series, vol. 6, page 164, Judge Miller, in an elaborate opinion, held that the statute of the state of Wisconsin, (a cognate or kindred statute to the one under consideration), confers no lien, and that the statute not

creating a lien, the District court of the United States has no jurisdiction *in rem*, at the suit of a domestic creditor against a domestic vessel, in admiralty. *Vide* also the *Velocity*, Law J., vol. 3, new series, No. 2; the *Globe*, Am. Law Journal, vol. 3, page 337.

We are therefore of the opinion that the statute law of California, in the case of domestic vessels, gives to the domestic creditor no lien, and no lien being created, this Court sitting in admiralty can exercise no jurisdiction. 1 W. C. C. R., page 130.

As to the right of a party to proceed *quasi* in *rem* against the proceeds, we will consider in another part of this case.

The conclusion to which we have arrived, in the discussion of this subject, supersedes the necessity of any examination into the extra territorial effect or operation of a local statute.

In reference to one item, $300, money advanced by Peter Donaho to Hunt & Scranton, and which was subsequently paid by Price, Green & Co. on the application of J. H. Scranton, it is claimed that Donaho had a lien at common law, and that on the payment of the money by Price, Green & Co., they, by operation of law, were subrogated to the rights of Donaho. From all that we can see, it does not appear that this sum of $300 ever was advanced by Donaho in any other way than as a loan, and upon the personal credit of Hunt & Scranton. Donaho could not have supposed that he had any security in the ship, for we find the money is shortly after paid over by plaintiff, under an arrangement with Scranton. We cannot, therefore, see how this would give Price, Green & Co. the right to intervene.

It is claimed that the defendants are estopped by their own silence at the time these moneys were advanced. It does not appear that any knowledge was brought home to Mensesheimer & Lightner, or that they made any representation whatever calculated to mislead or deceive any one acting with ordinary precaution. No application was made to them. The registry stood in the name of Knight. It does not appear that any application was made to the administrator of the estate of Knight, or that

any application was made by the Pacific Mail Steamship Company, the *cestui qui trust;* or that an inquiry was instituted in any quarter, if indeed the plaintiffs intended relying upon the steamship as security.

This ship is found like a waif upon the waters in the ports of California. The owner, so far as indicated by the register, dead for years. A party assuming to act as master, who, as alleged, had no personal credit, aided by another in contracting liabilities, similarly situated pecuniarily, and yet no inquiries, none of the ordinary precautions or safeguards resorted to which the circumstances of the case were calculated to suggest, and which are practiced and so well understood by financiers upon this coast.

We are satisfied that there was nothing in the conduct of Mensesheimer & Lightner which would give these plaintiffs the right to recover on this ground.

The plaintiffs claim that courts of admiralty are the Chancery courts of the sea, and are governed by equitable rules, and that surplus funds, when in the registry, will be distributed under an application of these rules. The *Sarah Ann*, 2 Sum. 206. And that in this way courts pay, out of the surplus funds, persons who have no lien, those who have had a lien and waived it, those having common law liens, and parties having a right of action in admiralty against the owners, and therefore claim that although they may have no right to proceed in *rem* to enforce a part of their bill, yet that being in this Court as suitors *in rem*, they have a right to be considered as petitioners *quasi in rem* against surplus proceeds. The authorities are numerous in which such equities have been recognized and enforced. The *Stephen Allen*, Blatchford, 175; the *John*, 3 Robdm. R., cited in 4 Washington, C. C. R., 459, 460; Abbott, page 148; *Santa Anna*, Blatchford, 79; 4 Washington, C. C. R., 453; 2 Woodbury and Minot, 92.

There is an authority in 1 Conkl., U. S. Admiralty, page 63, which arose under the local laws of Pennsylvania, adverse to the ruling in many of the cases cited, and if applied to the pe-

culiar state of facts, which are proven to exist in this case, would exclude an appropriation of any part of this surplus fund to the plaintiffs' bill. Looking upon this case as we do, it is not necessary that we should express an opinion upon the ruling in the case cited.

The general principles upon which this authority is exercised by the courts of admiralty, have been much qualified from time to time, in the various rulings upon the subject. From many of the authorities, the principles involved would seem to be that courts have assumed a *quasi* Chancery authority to dispose of such surplus, according to justice, and to have supposed that this anomalous control over the surplus funds was called for from the necessity of the case, and to prevent palpable injustice.

It would appear that the claim should be something more than the claim of a mere personal nature—that it should partake of a maritime character, although not actual cause for maritime lien. And another principle which would seem to pervade the rulings is, that they have relations to a subject and to parties all within the jurisdiction of the court.

There is another principle which we think underlies this superstructure, and that is, that there shall be no adverse interests in third persons which oppose it. 4 Wash. C. C. R., 458.

We think that in this case, there are adverse interests, vested in third parties, which would exclude the plaintiffs from any participation in this surplus fund. The evidence shows that Frankel is now one of the owners, by virtue of bill of sale from Mensesheimer; that he has interests which are adverse, and which, if this application is allowed on the part of the plaintiffs, must work great injustice to him. In addition to this, we can know nothing of the equities which may exist between Frankel & Lightner.

We are therefore of the opinion, that, upon this branch of the case, the plaintiffs are not entitled to recover.

There is one item in the bill of the plaintiffs, to which we have not adverted, viz: Factorage, brokerage, commission, ex-

penses in unloading, and in the re-loading and storage, amounting, in the adjustment of general average, to $848.40, which is a charge, and for which the ship is responsible, and as this money was collected by the ship, and went into the pockets of the owners, we think it a legitimate charge, and should be paid out of the fund. Abbott on ship, 602 and note. We therefore think that $848.40, with interest at the rate of 10 per cent. per annum, should be paid to the plaintiffs, Price, Green & Co. The balance of the fund, after payment of the fees and costs due the officers of this Court, should be paid over to Frankel & Lightner.

We therefore direct that a decree be drawn by the counsel in conformity with this opinion, and submitted to the Court for approval.