THE NEW ENGLAND INSURANCE COMPANY, *vs.* THE BRIG SARAH ANN, WOODBURY AND OTHERS, CLAIMANTS.

The right of the master to sell a vessel stranded, depends on the circumstances under which it is done to justify it. The master must act in good faith, and exercise his best discretion for the benefit of all concerned; and a sale can only be made on the compulsion of a necessity, to be determined in each case by the actual peril to which the vessel is exposed, and from which it is probable, in the opinion of persons competent to judge, the vessel cannot be saved. This is an extreme necessity.

The true criterion for determining the authority of the master to sell a vessel stranded near a foreign port, or in a port of the United States, or of a different state than that to which the vessel belongs, or in which the owners may be or reside, when the necessity occurs, is the distance of the owners or insurers from the scene of stranding. If by the ordinary means to convey intelligence of the situation of the vessel, the master can obtain directions as to what he should do, he should resort to those means. But if the peril is such that there is a probability of loss, and it is made more hazardous by every day's delay, the master may act promptly to save something for the benefit of all concerned, though but little can be saved. There is no way of doing so more effectual, than by exposing the vessel to sale; by which the enterprize of such men is brought into competition as are accustomed to encounter such risks, and who know from experience how to estimate the probable profits of such adventures.

The power of the master to sell the hull of the stranded vessel, exists also as to her rigging and sails; which he may have stripped from her, after unsuccessful efforts to get her afloat, or when the vessel in his own judgment and that of those competent to form an opinion and to advise, cannot be delivered from her peril.

If the master sells without good faith, or without a sound discretion, the owner may, against the purchaser, assert his right of property in the sails and rigging; as he may in the case of a stranded vessel, which has been sold without good faith in the master.

The Court do not think the case of Smith *vs.* Briddle, 2 Washington C. C. R. 150, sound law. It is expressed in terms too broad.

APPEAL from the Circuit Court of the United States for the district of Massachusetts.

In September, 1834, in the District Court of the United States for the district of Massachusetts, the New England Insurance Company filed a libel stating that they were the true owners of the brig Sarah Ann, then in the district of Massachusetts, and in the possession of Obadiah Woodbury and others, claiming to be the owners of the said brig, and who are about to carry her to sea without the consent of the libellants.

A summons was issued to Obadiah Woodbury and others, commanding them to appear and show cause why process should not issue against the brig, as prayed for in the libel; and they appeared, and gave stipulations to abide by the final decree of the Court, on an appeal, and put in an answer to the libel.

The case was proceeded in by the libellants, and the respondents in the District Court, and after testimony had been taken to the matters in controversy, a pro forma decree for the respondents, dismissing the libel, was given by the district judge, by the consent of the counsel of both parties; and the libellants appealed to the Circuit Court of the United States, for the district of Massachusetts.

Further evidence was taken in the Circuit Court by the appellants, and the defendants; and at May term, 1835, the Circuit Court

gave a decree in favour of the defendants; from which the New England Insurance Company prosecuted this appeal.

The facts of the case were as follow:

On the first day of March, 1828, the appellants, at Boston, underwrote a policy of insurance on the brig Sarah Ann, valued at four thousand dollars, in port, and at sea, during the term of one year, from the 22d of February, 1828. On the 25th of March, 1828, the brig was stranded on the shore of the Island of Nantucket, and on the following day an abandonment was made by the owners for a total loss by the perils of the sea. The abandonment was expressly refused by the assurers, but it was not withdrawn by the owners of the vessel; and on the third of October, 1828, a compromise was made between them and the assurers, and all the right and title of the assurers in the brig was assigned to the appellants. The claimants of the brig, the appellees, asserted a title derived under a sale made by the master after the stranding, on the ground of an absolute necessity for such a sale.

In May, 1828, the brig was brought into Boston, after having been gotten off from the shore at Nantucket, and having been repaired. The repairs of the brig, and her cost at the sale made by the master, amounted to twenty-four hundred and ninety-four dollars and sixty-seven cents; and she was sold in Boston, in July, 1828, for $2736 41. On the 14th of May, 1828, the president of the Insurance Company, wrote to the agent of the former owners of the brig, the assured, stating that the brig was then in Boston, and saying, "As she is now within your own control, as agent for the owners, if you do not take possession of her in their behalf, the Company must consider the sale of her at Nantucket, as affirmed by them; and that she is sold for their account. We of course shall contest the validity of the sale as it regards ourselves, and we think the owners ought to contest it themselves."

At this time the title to the brig was in contest between the assured, and the assurers. The abandonment was denied to be good; and neither party was in a situation to assert a title without compromitting rights then actually in contestation. There were no allegations or proofs in the cause that after the final acceptance of the abandonment, in October, 1828, the brig had been within the ports of Massachusetts, and within the reach of the process of the Court for a reasonable time, within the knowledge of the appellants.

The facts of the case, as stated in the protest, and as detailed in the decree of Mr. Justice Story, in the Circuit Court, 2 Sumner, 213, were: "The brig having on board a cargo of rice and cotton, sailed on a voyage from Savannah for Boston, and on the 23d of March, 1828, was stranded on the south-west side of the island of Nantucket. On the next day assistance was obtained from the shore, and the anchors were got out and hove tight, in order to start the vessel, but without success. In the course of the forenoon the wreck-master came on board, with twenty men, and pursuant to his directions, the deck load was thrown overboard. They then hove

the cables again, but with no beneficial effect. They then proceeded to open the hatches and discharge the cargo from the hold; and then hove out the cables again, but to no purpose, as the tide had fallen, and there was a considerable surf rolling in shore.

The captain and crew remained on board that night, and the day following nothing could be done, as the wind blew strong at the south-east, and there was a heavy surf. After the weather moderated, the cargo was, with great difficulty, got on shore. The protest stated, that the wind and the surf of the sea, had driven the brig so far on shore as to render it impossible to get her off.

It further appeared from the evidence, that the place where the brig was stranded was on a sandy beach, about twelve miles distant by sea, and six miles by land, from the town of Nantucket; and that the brig was at no time high and dry there. The depth of the water about her varied; sometimes it was six feet, and sometimes it was ten feet; and she was at no time of tide out of water. The cargo was discharged in about five days; and the spars, sails, and rigging were then stripped off, and carried on shore, and sold in small lots to the highest bidder. After the cargo was sold, the brig became loose in the sand, and slewed round, and lay with her broadside to the shore. She was sold on the 28th of March, by the master, at public auction, where she lay, for $127; at the same time the spars, sails, and rigging were sold, for $422 40. No efforts appeared to have been made to get the brig off the shore, though she had not then sustained any serious injury. Three intelligent surveyors, at a subsequent period, estimated the repairs of her hull, as not exceeding $492 25. The brig was got off by the purchasers soon after the sale; and was carried to the port of Nantucket, and there repaired. The whole cost of the brig to the purchasers, including the repairs, and outfits to Boston, was represented to have been, $2494 67; and she was sold under the order of the purchasers, as stated, at Boston, in July, 1828, for $2736 41."

The case was submitted to the Court, on printed arguments, by Mr. Pickering for the appellants; and by Mr. Saltonstall, for the appellees.

The argument for the appellants stated;

The appellants contend that this case was not such as to require or justify a sale of the vessel by the master, upon the alleged ground of necessity, as the owners' agent and the underwriters were in Boston, and there was an easy and regular communication by mail between Boston and the island of Nantucket where the vessel was ashore; and they might and ought to have been consulted by the master before making such sale.

In cases resting upon the same principles, for example, hypothecation by the master in cases of necessity, the rule laid down by the English Courts is, that the master can hypothecate only when the vessel is in some other place than an English port. No English

case, it is believed, can be found, in which the master has been authorized to do it while in England; the English writers consider that every port in England is a home port, and the residence of the English owner.

The learned author, Abbott on Shipping, 123, adds that Ireland has been held to be a foreign country; but that since the Union it is doubtful whether the rule is not altered. See also the case of the Lavinia, Barclay, befo e Mr. Justice Washington, 1 Wash. C. C. R. 49. So in cases of the lien of material men, the Courts of the United States have held, that when a vessel was repaired in a port of a state to which she did not belong, there was a lien by the general marine law; but if the repairs were made in her own state, there was no lien, unless established by the local laws of such state. The General Smith, 4 Wheat. 438. 4 Peters' Cond. Rep. 439.

As to the necessity of the sale, generally, it is a prominent fact that the vessel was got off very soon after she was sold on the sandy shore, which was a smooth beach without any rocks, and she was immediately repaired and fitted for sea again.

The brig Pearl, 2 Sumner's Rep. 217, to which the Circuit Court alludes in giving the opinion of the case at the bar, was stranded nearly in the same place with the Sarah Ann, and lay there through the winter, and was got off in the following spring. Several other vessels which went ashore on the same island have been got off, as appears by the depositions in the case.

In the case of Gordon *vs.* Massachusetts Fire and Marine Insurance Company, 2 Pick. Rep. 249, the vessel belonged to Portland, Maine, and was stranded in St. Domingo, and the sale was held justifiable. In Idle *vs.* Royal Exchange Insurance Company, 8 Taunton, 755, (cited in the Massachusetts case just referred to,) a ship from London took the ground in the river St. Lawrence, below Quebec: but in this case, it is to be noticed that two of the owners resided in Quebec, and the sale was considered to be sanctioned by them; which distinguishes it from the ordinary case of sales by the master upon his own authority alone. In Hayman *vs.* Molton, 5 Esp. Rep. 65, the vessel went from London to Jamaica, where she got aground. In Read *vs.* Bonhom, 3 Brod. and Bing. 147, a London ship was lost in the East Indies.

The case of Thorneley *vs.* Hebson, 2 Barn. and Ald. 513, was that of a New York vessel insured in London, and, while on her voyage, so much injured by stress of weather, that the crew deserted her at sea: she was afterwards taken possession of by ships that fell in with her, and was brought into Rhode Island, about two hundred miles from New York, where the owners resided. She was sold under a decree of the Admiralty Court, for the salvors, at a great sacrifice; and the Court of King's Bench held, that the owners at New York " were near enough to have acted in the business at the time;" and might have prevented the sale by raising money to release the ship, and therefore were not entitled to abandon to the underwriters; and so the sale was not justifiable.

[The New England Insurance Company *vs.* The Sarah Ann.]

In this case, Cannan *vs.* Meaburn et al., 1 Bing. 243, the master sold the cargo, under a decree of a Vice-Admiralty Court in the Isle of France, in order to defray the expenses of repairing the vessel which was "in a sinking state." The Court say, "Nothing but an extreme necessity" will justify the sale, &c. This was also a foreign port. The Court adopt the reasoning of Lord Stowell, in the case of the Fanny and Elmira, Edw. Admiralty Rep. 117, which again supposes a case where the ship is in a foreign port, where there is no correspondent of the owners, &c.

The leading case of the Gratitudine, 3 Rob. Ad. Rep. 240, is also that of a vessel being in a foreign port, and requiring repairs. The master was allowed to hypothecate the cargo. The learned judge, (Lord Stowell,) in his reasoning on the question of necessity, by way of illustration, puts the case of a ship driven into port with a perishable cargo, where the master can hold no communication with the proprietor, (see p. 259,) in which case the authority of agent is devolved upon him, &c. A similar illustration is again put at p. 261, still keeping in view, throughout, the idea of a foreign port as an ingredient in the necessity.

In a Massachusetts case, Bryant *vs.* The Commonwealth Insurance Company, 13 Pick. Rep. 543, a vessel was owned and insured in Massachusetts, and stranded on the coast of Virginia; the cargo was landed, and was not of a perishable nature, and might have been kept in reasonable safety until the owners and insurers in Massachusetts could be heard from; and it was held that the master had not authority to sell the cargo and break up the voyage, without waiting until the owners and insurers could be consulted. The Court in this case lay down the rule, that the necessity must be so strong as to leave no alternative to the master. They say, "The Courts have endeavoured to limit and guard this branch of the mercantile law with the greatest care; the strongest language has been employed," &c.

In Hall *vs.* Franklin Insurance Company, 9 Pick. Rep. 487, the Court say, "There must be something more than expediency in the case; the sale should be indispensably requisite. We mean, a necessity which leaves no alternative, which prescribes the law for itself, and puts the party in a positive compulsion to act."

The case of Scull *vs.* Briddle, 2 Wash. C. C. Rep. 150, was trover for certain sails, rigging, &c. which belonged to a vessel that was wrecked on the coast of Maryland. The vessel and tackle were sold at a public sale by the master. Mr. Justice Washington laid down the rule of law to be, "that in cases of extreme necessity the master may sell in a foreign country rather than let the property perish, but not in the country where his owner lives; and no case of the sort, it is believed, can be shown. Mischievous would be the consequence if such doctrines were tolerated." See also the case of Schooner Tilton, in the Circuit Court of Massachusetts, 5 Mason, 46.

The result of these cases is, that the legal necessity to justify a sale by the master, must be something more than a mere moral necessity: it must be such a case of urgency as, in the language of the Court in Massachusetts, "to leave no alternative;" and the degree of this necessity may be the better understood by the important circumstance mentioned in the leading cases, viz. that the disasters in those cases happened to the vessels while in foreign ports, and where the master had no opportunity of consulting the owners.

Further: it is not enough that the master makes a sale in good faith, although this must accompany the necessity; and this latter must be clearly and indisputably made out. It may be also added, that sound policy demands that sales of this description should not be too much encouraged, by affording facilities to masters to effect them; especially in cases like the present, where they have the means of consulting their owners in their own state or country.

But if the Court should think that the facts prove a case of legal necessity, in respect to the sale of the hull of the vessel; the libellants still contend that there was no such necessity as to the sails and rigging, &c. These had been taken out, as well as the cargo, and had been carried on shore in safety.

Instead of selling the sails and rigging on the spot, under every disadvantage, such as exacting cash in hand, and the purchaser to take the risk of title, &c. the master should have either sent them to Boston, where the parties interested could have sold them to the best advantage, or he should have immediately given information of their having been brought on shore, and then waited for orders. If sold at Boston, they would have brought one thousand dollars, or upwards; as, according to the usual estimate, the sails and rigging, &c. are considered about equal to the value of the hull, or half the value of the entire vessel.

At all events, whatever might have been the value of the sails and rigging, there was no necessity for selling them, as they were already landed, with the cargo; and the master might easily have advised the owners and underwriters, and waited for their orders; which, by the usual course of the mail from Boston to Nantucket, would have reached him in two days. In point of fact, the libellants did send an agent to Nantucket, as soon as the loss was known in Boston, who offered to pay all expenses incurred, &c. if the vessel could be delivered to him; but the sale had already taken place, and the purchasers refused to relinquish the vessel to the agent.

In conclusion, the libellants would respectfully urge upon the consideration of the Court the consequences of sanctioning sales of this kind, made under circumstances which do not clearly and unequivocally amount to the strict legal necessity which the Courts have required. The greater the facilities that are afforded, the stronger will be the temptation to make such sales fraudulently: and the fraud will be the more difficult of detection. in proportion

[The New England Insurance Company *vs.* The Sarah Ann.]

as the necessity will be a question to be settled more by the opinions of the master and other witnesses, than by simple matters of fact. And even in cases where there may be no direct fraudulent intent, the facility of selling will proportionally lessen the efforts of the master and seamen to rescue their vessel from impending danger and loss; and the owners and underwriters will be made to suffer accordingly.

The Court must, in this and other cases, give weight to the important considerations of public policy, or expediency, in laying down practical principles which are to govern the conduct of parties; and it is manifest, that far greater mischiefs will follow from allowing facilities in making such sales, especially in home ports, than by rigorously restricting them to cases of absolute necessity—such a necessity as, in the language of the Courts, "leaves no alternative."

Mr. Saltonstall, for the appellees, submitted the following points:

1. The sale made by the master was, under the circumstances, justified by necessity. It was made by him in good faith. There was a moral necessity for it. The hazard to which the brig was exposed was so great, the expense that must be incurred in attempting to get her off would be great and certain, and the result of further attempts so uncertain, that the sale was justifiable, and passed the property to the purchasers.

2. The sale was assented to and adopted by Crosby and others, afterwards, who thus ratified the act of the master; and their assignees cannot stand in better right than they were.

3. Though the abandonment was not revoked, but was continued, yet the libellants cannot accept it six months after it was made, having first refused to accept it; and thus avoid the effect of the acquiescence and adoption of the master's acts by the assured, by force of the technical rule, that an abandonment, when accepted, relates back to the time when it was offered.

4. The sale by Folger and others to the claimants was made in Boston, July, 1828. The libellants knew the brig was in Boston in May preceding, but gave no notice to the purchasers or their agent, and took no steps to prevent a sale. This, it is contended, is a fraud on the claimants; and a Court of equity, (which a Court of admiralty is, with limited powers,) will not aid a party who thus stands by, and, by his silence and inaction, permits another, without notice, to purchase. It is a fraud on the innocent bona fide purchaser.

5. The demand of the libellants is stale, and cannot now be set up and enforced. The vessel was abandoned March 29th, 1828; the libel was not filed until September, 1834, more than six years afterwards.

6. If the sale be adjudged void for want of authority in the master to make it under the circumstances, and not ratified by the acquiescence of Crosby and others, with the knowledge of the libellants; if the libellants are not estopped by their silence and inaction,

and the suit was commenced in due season, then the claimants ask to be allowed the expenses and reasonable reward for their vendors' (the purchasers and salvors) labour and hazard; which amounts to nearly the sum for which she was sold.

1. The first point presents two questions: first, as to the authority of a master to sell his vessel, and under what circumstances; second, whether the sale in this case was justifiable.

As to the authority of a master to sell on the ground of necessity, the law has been fully examined in England, and by this Court, as well as in Massachusetts, New York, and other commercial states, within a few years, and has been clearly settled.

We believe it to be correctly stated in the opinion of the Circuit Court in this case, 2 Sum. R. 206. "I agree at once to the doctrine," says the learned judge, p. 215, "that it is not sufficient to show that the master acted in good faith, and in the exercise of his best discretion. The claimants upon whom the onus probandi is thrown, must go farther, and prove that there was a moral necessity for the sale, so as to make it an urgent duty upon the master to sell, for the preservation of the interest of all concerned. And I do not well know how to put the case more clearly than by stating, that if the circumstances were such, that an owner, of reasonable prudence and discretion, acting on the pressure of the occasion, would have directed the sale, from a firm opinion that the brig could not be delivered from the peril at all, or not without the hazard of an expense utterly disproportionate to her real value, as she lay upon the beach, then, the sale by the master was justifiable, and must be deemed to be made by a moral necessity. And I consider this to be the true doctrine, deducible from the case of Gordon *vs.* the Massachusetts Fire and Marine Insurance Company, 2 Pick. R. 249; where the subject is examined very much at large, and with great ability."

We believe the doctrine on this subject to be here truly stated, and are willing the conduct of Captain Phillips should be tested by it.

The law on this subject was fully examined in the case cited, 2 Pick. R. 249, by the late distinguished Chief Justice Parker, of Massachusetts. It has come under the consideration of the same Court in several subsequent cases, and has been revised; but, on a careful consideration of the cases, it will be found that the doctrine of the first case has not been varied, but, on the contrary, has been confirmed. Hall et al. *vs.* The Franklin Insurance Company, 9 Pick. 466. Winn et al. *vs.* The Columbia Insurance Company, 12 Pick. 279. Bryant et al. *vs.* The Commonwealth Insurance Company, 13 Pick. 543.

In the case 9 Pick. 466, the sale was not justified; but it was on account of the particular circumstances, as each case indeed must depend on its own circumstances. The ship was on a voyage from Boston to New Orleans; struck on the coast of Florida; was got off, and proceeded to Key West. She did not leak, and might have remained there in safety until notice of the disaster should have been sent to Boston; and after the sale, the vessel in fact proceeded to

Boston, with the same master, and without any repairs. It was properly held that the sale was not necessary, and that the insurers were not affected by it. Bryant *vs.* Commonwealth Insurance Company, was the case of a cargo, insured from Havana to Castine, in Maine; the vessel was wrecked about forty miles from Norfolk, but the cargo was taken from the vessel without damage, and might have been sent to its place of destination for less than fifty per centum of its value; but the master sold it on the beach; and it was held that there was not a legal necessity for the sale.

It is very clear that the sale was not justifiable, according to the doctrine in Gordon's case: and as clear that there is no similarity between the circumstances of that sale and the sale of the brig Sarah Ann. This subject has come under the consideration of this Court, and the law is settled on the same principles as in the cases cited. Patapsco Insurance Company *vs.* Southgate et al., 5 Peters' Rep. 604.

It can hardly be understood to have been settled in England, that a master has authority to sell a ship on the ground of necessity, until the case of Idle *vs.* The Roy. Ex. Ass. Co., 8 Taunt. R. 770, and 3 Moore. In that, and in subsequent cases, it is placed on the same ground as in this country; and that is, the ground of necessity —moral, legal necessity, arising from extreme peril and the danger of delay. It follows necessarily from the relation of the master to those interested, that there must be this authority. It supposes a case of extreme peril. What is to be done? It will not do to wait until the owner can be consulted. There is a necessity for immediate decision and action. In such cases the master may do what he might well suppose the owner would do if present; and, in the exercise of a sound discretion, sell the vessel and appurtenances.

It follows from the principles and the reasons on which this authority rests, that it cannot be affected by the circumstance in what country the disaster happened; whether in a foreign country or not. There is no case in which it is decided that this authority is limited to cases happening in a foreign country. The question is, in every case, whether there was an urgent necessity for the sale—whether a delay would be extremely perilous. In such a case it would be absurd to say that the master shall not sell, because the vessel, though exposed to immediate destruction, is in the country of the owner's residence. And in a country of such vast extent as ours, the doctrine suggested would be extremely injurious in its consequences. In most of the decided cases, as might be supposed, the stranding happened abroad. In the case of hypothecation, the vessel is supposed to be in safety. The question is as to funds for repairs and outfits; and in such cases it is reasonable that in a country of such limited extent and facility of communication as England, the owner should be consulted. There can seldom be a necessity for instant action. Still, Ireland, and it is believed Scotland, are considered to be foreign countries: and it may be remarked that Nantucket is farther from the main land than Ireland is from.

England, and that the owners were five hundred miles from that island, and in another state.

The case of Scull *vs.* Briddle, 2 Wash. Cir. R. 150, is very briefly reported; and this point was not essential to the decision, which was mainly placed on another ground.

In Idle *vs.* the Royal Exchange Assurance Company, the decision was not placed at all on the circumstance that one of the owners was present; on the contrary, Dallas, Ch. Jus., remarked, "I should further say, that on the broad ground of a power to act on a sudden emergency, in order to save as much as could be saved from impending ruin, whether the sale be by the owner or the captain will make no difference; if the circumstances justified the selling, and the sale was honestly and fairly conducted." And with another remark of the same learned judge the consideration of this part of the case is closed: "Although general principles are highly valuable when they can be of general and extensive application; yet, from the very nature of subjects of this description, the application of principles, as far as decided cases furnish any rule, must depend upon the circumstances of the particular case."

It is contended, that under the law as settled, the sale of the Sarah Ann was proper and justifiable. This makes it necessary to look to the evidence.

Was, then, the sale justifiable? Under all the circumstances, was it necessary for the captain to sell the property? If it was a valid sale, then the title of the claimants is unquestionable. This depends on the state of things at the time. What was the situation of the vessel when the captain despaired of getting her off, and determined to unlade the cargo, to strip the vessel, and to sell the property there? It is necessary to look at the evidence. The depositions, on the part of the claimants, are very strong; and, we think, conclusive on this question.

As to the main facts, they are uncontradicted; on the contrary, as to the exposure of the brig, &c., they are corroborated by Pease and Gardner, two of the libellants' witnesses. As remarked by the learned judge before whom the cause was tried, 2 Sum. R. p. 216, we must look to the state of things as it was at the time of the sale, and weigh all the circumstances; as, the position and exposure of the brig; the season of the year and chance of storms; the danger from storms; the expense of further attempts to get her off; the probable chances of success; and the necessity of immediate action on the part of the master. The object of the captain at first, and as long as there appeared to be any hope, was to get her off. He made use of judicious and strenuous exertions, availing himself of the skill and experience of George Myrick, the wreck-master, until the gale drove her so far on shore, that all further exertion seemed to be hopeless.

As to the place where she lay, on the south-west shore of Nantucket, a reference to a map or chart will show at once that she was exposed to the whole reach of the ocean, from southwest to

southeast. No spot on the coast is more exposed to peril: and this is not contradicted by a single witness, except, perhaps, by Captain Atkins Adams, who went to Nantucket, where he never was before, as agent for the underwriters, and was within half a mile of the spot. At the time of the sale, the brig lay on an open shore of shifting sand, nearly high and dry; her cargo discharged, and the sails and rigging taken on shore to save them.

Then, as to the probability of a gale. It will be seen by the testimony, that storms, and severe storms, are frequent at that season of the year. It was in the month of March; proverbially blustering and stormy.

But the great objection to the sale is, on the ground that it was in the country of the owners' residence; they residing in Hampden, Maine, and that they had an agent in Boston. There is nothing in the evidence to show that Thomas Curtis was agent for the owners, and known to be such to Captain Phillips, except for the purpose of obtaining insurance. It is conclusively proved that there was a necessity for immediate action, and that a delay for the purpose of receiving instructions from the owners or their agent would have been attended with extreme hazard. Information of the state of the vessel was sent to Boston March 23. The abandonment was March 29, probably immediately upon the receipt of the letter. And it is believed, that at that time, in the month of March, the mail from that island to Boston was seldom less than a week. There was then no steamboat communication.

We contend that Captain Phillips could not have done otherwise than he did, after having, without success, attempted to get the vessel off, without the most gross carelessness. No course was left for him but that which he pursued, to discharge the cargo, and get on shore the sails, &c., as soon as possible; and sell them there, to save what he could, for whom it might concern.

The vessel was, in fact, got off by the purchasers. We are not to judge by the event, but by the situation at the time of the sale. The captain may act with perfect propriety in selling; a ship may be, to all appearance, in a desperate situation, and yet she may most unexpectedly be saved. That was the case of the ship Argonaut. Peele et al. *vs.* the Merchants' Insurance Company, 3 Mass. R. 28. Her situation was much like that of this brig, it seemed to be desperate; but she was saved: and yet the learned judge, in a most able and elaborate opinion, decided that "the owners had a good right to abandon, under the circumstances, even if the injury was less than half the value."

As to the chance of success in attempts to get this vessel off, there is one fact of the utmost importance; that is, the price she brought. Consider the circumstances—that this sale was only twelve miles from that wealthy and enterprising maritime place, Nantucket; that ample notice had been given of the sale; that there was a large company present; that there was no collusion or private agreement, but that the sale was fairly conducted; that several companies wer

formed to purchase, if she did not go too high; and yet that the hull was sold for $125, and the whole amount of sales was only $549!. Now, how can this be accounted for? Clearly, only because it was thought, by the best judges on the spot, that taking into consideration the chances of saving the vessel, and the expense that would attend the attempt, she was worth no more. This fact is considered to be of the utmost importance when taken in connexion with the opinions of the witnesses as to the value of the vessel as she lay, and as to her desperate situation, and the necessity of the sale. And the result shows that the price given was as much as she was worth. The whole cost and expense of the purchase and repairing the brig was $2,694; and she was sold, after being in Boston two months for sale, for $2,736, little more than an indemnity to the purchasers. And the vessel was valued just before, in the policy, at only $4,000.

To the actual expense necessary is to be added the risk that it would be lost by the total loss of the vessel.. Great expenses were, therefore, necessary, and it was uncertain how much, and whether they would not be lost.

What, under these circumstances was the captain to do? We think he ought to have done just what he did; and, indeed, that his whole conduct was prudent and judicious. We think he ought to have made use of proper means and exertion to liberate his vessel. That he did. And, afterwards, when she had been driven upon the beach, almost high and dry, and was then fastened in a place where six only of twenty-three vessels had been saved, with no means there of making further attempts to get her off—and this in a season of storms, and when a gale would, almost to a certainty, have been fatal to the vessel,—we contend that he did right to sell the vessel and appurtenances, and save what could be saved, for whom it might concern. He was justified by the necessity of the case. In the strong language of the Massachusetts court, which must be reasonably construed, or no sale would ever be necessary, "there was no alternative." But good faith must accompany the necessity, and must be clearly made out. Upon this point there can be no question in this case. The whole conduct of the captain shows that he acted from good motives, and in perfect good faith. No other motive can be suggested for the sale under the circumstances. The case, therefore, is brought clearly within the principles of law as settled on this subject.

But it has been suggested, on the part of the libellants, that there could have been no necessity for selling the sails, rigging, &c., as they might have been stored or sent to Boston.

But there is no evidence to show that any part of the sails and rigging, or of the appurtenances sold, were connected with the vessel at the date of the libel. By the account of sales it appears that they were sold in small lots to many different persons. The sale was six years before the libel; the vessel had been constantly

employed; and the presumption, therefore, is, that no part of the original sails and rigging remained connected with the brig.

It may be observed that, in the case of Idle vs. the Royal Exchange Assurance Company, and in most of the cases, the sails, rigging, &c. were separated from the vessel, and sold in different lots, but at the same time.

2. We say that the sale was adopted by the assured afterwards; that they thus ratified the act of the master; and that the libellants, claiming under them, as assignees, cannot stand in a better situation than they were.

The sale was on the day when the offer of abandonment was made. That abandonment was expressly rejected. Whose vessel was she, then, at the time of the sale? We say, the original owners'; and that they, and all persons claiming under them, must be bound by their ratification of the sale, and by their conduct, as much so as if they had stood by and directed the sale.

We contend that the libellants cannot now be permitted to take different ground. Having taken the assignment subsequently to the acquiescence of Crosby et al., the libellants are bound by it. Courceir vs. Ritter, 4 Washington C. C. R. 549. Pierce vs. Clark, 1 Barn. and Cres. 186. Cairnes vs. Bleecker, 12 Johns. Rep. 300. Codwise vs. Hacker, 1 Caines R. 526. Marsh vs. Gold, 2 Pickering, 289. Clark's executors vs. Reimsdyke, 9 Cranch, 153.

3. As to the third point; we think it is necessary to look to the situation of the parties at the time of the acceptance of the abandonment, in October; and we contend that the respondents had acquired rights under their purchase, by the conduct of the libellants. They refused the abandonment; they disclaimed any ownership in or right to the brig; the original owners stood by and saw the sale on the beach, and afterwards in Boston, to the respondents, without objection or claim. By this acquiescence the respondents acquired rights as against the original owners. Shall they now be defeated by the supposed relation back of the settlement in October, to the offer to abandon in March, which, at the time, was repudiated? On this point we ask the consideration of the Court.

4. The conduct of the libellants was a fraud on the claimants. In May, 1828, they knew the brig was in Boston, and for sale, but they took no steps to prevent it. They did not notify the master and part owner, or Cartwright, the agent for selling, or the public, in any way, of any claim, or any objection to the sale. How were the purchasers to know of any objection? Suppose they had inquired—to whom should they go? The selling agent had no knowledge of any objection on the part of Crosby et al. or the libellants. She was registered in the names of the purchasers. The respondents had a right to suppose from the conduct of the libellants, that they made no claim; and indeed they did not at that time. But they were bound to give notice of their situation: and their standing by in silence and inaction, and permitting another to purchase,

is a fraud which can receive no favour in this Court, upon a proceeding in admiralty. Wendell vs. Van Rensselaer, 1 Johns. C. R. 344, and cases cited by Kent, Chancellor. Storrs vs. Barker, 6 Johns. C. R. 166.

5. The demand is stale and cannot now be enforced. The libel was not filed till six years and a half after the abandonment.

If the libellants' title relates back to March, 1828, for one purpose, it must for another. They ought then to have enforced their claim without so great delay. The vessel was owned and employed in Gloucester, a short distance from Boston. She was often in Massachusetts; and might, with proper diligence, have been seized at an earlier period by the libellants: and if any doubt exists of this, the claimants ask leave to amend their answer and file proof of the fact. They ought not to have delayed enforcing their claim almost six years. Willard vs. Dorr, 3 Mass. 161. Schooner Adeline, 9 Cranch, 243. Mary Anna Flora, 11 Wheaton, 1.

6. In support of the sixth point in the brief statement, the claim of amelioration, we refer to this case, 2 Sum. 220. The Perseverance, 2 Rob. 239. Nostra de Conceisas, 5 Rob. 294.

Mr. Justice WAYNE delivered the opinion of the Court.—

This is an appeal from the Circuit Court of the United States for the district of Massachusetts, and has been submitted to this Court on the printed arguments of the counsel for the libellants and respondents. Those arguments so entirely occupy the grounds relied upon in support of the respective rights of the parties, and the case has been so fully considered in the Court below, as it is reported in 2 Sumner, 206, that this Court has little left for it to do, than to announce its opinion upon the points it deems material for its decision. This will be done briefly. The particular case will be better understood and settled, by inquiring what is the right of the master to sell a ship in the event of an admitted stranding? This involves the necessity for a sale, in the circumstances under which it is done, to make it justifiable in the master, or otherwise. All will agree that the master must act in good faith, exercise his best discretion for the benefit of all concerned, and that it can only be done upon the compulsion of a necessity, to be determined in each case by the actual and impending peril to which the vessel is exposed; from which it is probable, in the opinion of persons competent to judge, that the vessel cannot be saved. This is, as it is decided in some of the English Courts, an extreme necessity. The master must have the best information which can be got, and must act with the most pure good faith. So says Lord Ellenborough in Hayman vs. Molton, 5 Esp. 65. It is also properly termed a moral necessity, because when the peril and information concur, as we have just stated, it then becomes an "urgent duty upon the master to sell, for the preservation of the interest of all concerned." It should not be termed a legal necessity, as it is in the argument of the counsel for the libellants; for though the necessity, information, and good faith

of the master will make the sale legal, the term legal is not descriptive of the prerequisite upon which the master's right to sell depends. Nor can the necessity for a sale be denied, when the peril, in the opinions of those capable of forming a judgment, make a loss probable; though the vessel may in a short time afterwards be got off and put afloat. It is true the opinion or judgment of competent persons may be falsified by the event, and that their judgment may be shown to have been erroneous by the better knowledge of other persons, showing it was probable the vessel could have been extricated from her peril, without great injury or incurring great expense; and the master's incompetency to form a judgment or to act with a proper discretion in the case, may be shown. But from the mere fact of the vessel having been extricated from her peril, no presumption can be raised of the master's incompetency, or of that of his advisers. It is right also to test the peril in which the vessel may be, by information of the locality where she is stranded, by the season of the year, and by a comparison of the number of vessels lost or saved, which have been driven on the same beach or shoal. But in doing so, though it shall be found that a larger number of vessels stranded have been got off than were lost on the same beach; it is very difficult in a case of stranding upon a shifting beach of sand, with the wind blowing hard on shore, and in a month when the winds are usually strong and stormy, to disprove the necessity for the master to sell, by what may have happened in other cases. The evidence taken in this case establishes, that five to one of the vessels stranded where the Sarah Ann was driven on the beach, have been altogether lost. The evidence in such a case, and under such proof of the loss of vessels there, must be very strong before it can prevail to show that there was no necessity for the master to sell. It must also be proved, in a particular case given, that the means in the master's power, or which he may command from those to get his vessel off, had not been applied, and that there would have been what we shall call, and what ought to be so esteemed, a controlling difference between the value of the vessel, as her condition may be when she is old, and the expense to be incurred in getting her off. Nor will any ascertainment of the cost of repairs subsequent to the extrication of the vessel, raise a presumption against the necessity to sell, whatever may be her condition as to strength, and though she may not be injured in the hull, if the actual and immediate prospective danger menaces a probable total loss. We think such was the Sarah Ann's danger.

The Court then, having stated its opinion as to what makes an extreme necessity, it follows that it cannot be laid down as a universal rule, that the master's power to sell is limited to cases of extreme necessity in a foreign port, or in a port of the United States of a different state than that to which the vessel belongs, or in which her owners may be or reside when the necessity occurs. The true criterion for determining the occurrence of the master's authority to sell is the inquiry, whether the owners or insurers, when they are not distant

from the scene of stranding, can, by the earliest use of the ordinary means to convey intelligence, be informed of the situation of the vessel in time to direct the master before she will probably be lost. If there is a probability of loss, and it is made more hazardous by every day's delay, the master may then act promptly, to save something for the benefit of all concerned—though but little may be saved. There is no way of doing so more effectual than by exposing the vessel to sale; by which the enterprise of such men is brought into competition as are accustomed to encounter such risks, and who know from experience how to estimate the probable profits and losses of such adventures. And we here say that the power of the master to sell the hull of his stranded vessel exists also as to her rigging and sails, which he may have stripped from her, after unsuccessful efforts to get her afloat; or when his vessel, in his own judgment, and that of others competent to form an opinion and to advise, cannot be delivered from her peril. The presumption is that they are injured; they can never again be applied to the use of the vessel, and they must, ordinarily, become from day to day of less value. In fact they are a part of the vessel when stripped from her, and the mere act of separation by the vigilance and effort of the master, by which they are saved from the ocean, does not take them out of his implied power to sell in a case of necessity. The necessity does not, as has been supposed, mean that no part of her tackle, apparel, or furniture saved shall be sold, because they are no longer liable to loss; but when they are saved, whether a sound discretion does not require them to be sold for the benefit of all concerned. If, however, the master sells without good faith, or without a sound discretion, the owners may, against the purchaser, assert their right of property in the sails and rigging; as they may in any case of a stranded vessel, which has been sold without good faith in the master, with her sails and rigging standing. We do not think the case of Scull vs. Briddle, 2 Wash. C. C. Rep. 150, notwithstanding our respect for the memory of the eminent judge who made it, sound law. It is expressed in terms too broad. The mischievous consequences apprehended may be controlled in each case by such proof as we are obliged to depend upon to maintain and secure from abuse other interests, equally important to society in general as to individuals engaged in some particular pursuit. We think the interest of owners of vessels in cases of a sale by the master, when pressed to make it by necessity arising from the perils of the sea, is amply protected; and that the power of the master to sell is secured from abuse by the limitations placed upon the exercise of it, and by the obligation of the purchaser at the sale to maintain his ownership against the claim of the original owner, by showing that the necessity for a sale had arisen; that it was made in the good faith and sound discretion of the master. This certainly in the case of such sales, at home, gives to the owners of a stranded vessel a stronger guard against imposition and fraud, than they can have in sales made in a foreign port; and serves to support the correct-

ness of the opinion that the master's power to sell is not confined to a foreign port, or to a stranding in another state. This doctrine holds out no encouragement to the master to sell: it gives him no facility to sell, when it is not authorized by necessity, clearly made out, and exercised with good faith and sound discretion.

We have decided the two points in the case necessary to a right decision of it. It is unnecessary for the Court to examine other points argued by counsel, though they are in the record; and which it would have been necessary for the Court to consider, if the respondent's rights under the sale had not been established by the points decided.

We think the facts in the case, which will appear in the report of the case made by the reporter, show that the master of the Sarah Ann was in that necessity, from her stranding and daily probable loss, to make it proper for him to sell her hull, sails, and rigging, for the benefit of all concerned; that the sale was made upon the information and advice of competent judges, aiding his own judgment; and that it was made in good faith and in the exercise of a sound discretion.

The decree of the Circuit Court is therefore affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Massachusetts, and was argued by counsel. On consideration whereof, it is ordered, adjudged, and decreed, by this Court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed with costs.