THE JOSEPH OTERI, JR.

OTERI et al. v. SCHMIDT et al.

(Circuit Court of Appeals, Fifth Circuit. December 11, 1894.)

No. 320.

SHIPPING—INTERRUPTION OF VOYAGE — SALE OF GOODS BY MASTER—LOSS AND DAMAGES.

A steamship bound from New Orleans to Ceiba and Truxillo, Spanish Honduras, was denied inspection at the usual place, and the master changed his course to the island of Ruatan, where he learned that the authorities had issued orders not to permit his vessel to do any business on that coast. He then proceeded to Livingston, Guatemala, where, on the

advice of the United States consular agent, he turned over the goods to the latter, to be sold for the benefit of all concerned. The sum realized, as reported by the master, was but a small part of the invoice price. There was much delay in the meantime,—sufficient to have enabled the master to return to New Orleans, and consult with his owners and the shippers. *Held*, that the master had not acted with the good faith required under the circumstances, and the vessel was liable in damages to the shippers; and, further, that no injustice would be done in making the invoice price the measure of such damages.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This was a libel by William B. Schmidt and Francis M. Zeigler, partners under the name of Schmidt & Zeigler, against the steamship Joseph Oteri, Jr., (Mrs. Luela A. Oteri, claimant). The district court rendered a decree for the libelants, and the claimant and Joseph Oteri, her husband, and surety on the release bond, took this appeal.

The steamship Joseph Oteri, Jr., left the port of New Orleans on the 30th day of July, 1892, bound for the ports of Ceiba and Truxillo, Spanish Honduras, and having on board the goods shipped by libelants for those ports. The vessel proceeded on her voyage, and on arriving off the island of Utilla, Spanish Honduras, August 3d, signals were given for fruit inspectors to come on board, as had been done on previous voyages of the vessel, but, the master finding no response to signals, and seeing that the lighthouse was occupied by soldiers, and as the vessel had been seized and detained by armed forces on a previous voyage of the vessel at the port of Ceiba, Spanish Honduras, and fearing this would be done again, the master changed the course of the vessel, and proceeded to the island of Ruatan, Spanish Honduras, and was there advised by the United States consul at that port, and by an officer of Spanish Honduras, that orders had been issued by the government of Spanish Honduras not to permit the steamship Joseph Oteri, Jr., to receive inspection, laborers, or to transact any business on the coast of Spanish Honduras. The master then changed the course of the vessel, and proceeded to the port of Livingston, Guatemala, and there he was advised by John T. Anderson, Esq., United States consular agent at that port, to turn the goods over to him, and he would sell them for the benefit of the parties in interest. The evidence shows that the goods were turned over to, and were sold and disposed of by or under the direction of, Anderson, the consular agent at Livingston; and the claim is that the proceeds of the sale of the goods shipped by libelants and reported by Anderson is $741.88, which amount of money was tendered to libelants in the answer of respondents, and placed in the registry of the court. Testimony was taken, and the case submitted to the court, and on the 18th day of May, 1894, decree was rendered for libelants for $2,393.11, with interest from June 30, 1894, until paid, and costs of suit, being the proved value as per invoices at port of shipment, less the sum of $741.88, the amount tendered by respondents as due to the libelants on account of the proceeds of goods sold.

Guy M. Horner, for appellants.

W. S. Benedict, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and BRUCE, District Judge.

BRUCE, District Judge, after stating the facts as above, delivered the opinion of the court.

The testimony shows that Spanish Honduras was in a state of turbulence, and even war, at the time of the arrival of the vessel off that coast, and, on account of what had happened to this master and his vessel on a previous voyage to that country, when his ves-

sel was seized by an armed force, and, against his protest, used for a time as a transport for troops, and it coming to his knowledge that his vessel would not be allowed to transact any business on that coast, we think he had good grounds for apprehension for the safety of his vessel and cargo if he landed at the ports to which he was destined. After this, however, and after he had decided that he could not with safety land at Ceiba, or get to Truxillo, there seems to have been much delay, and it was not until the 14th, and even the 16th, of August, the last of the goods were disposed of at Livingston. It would seem that during this time the master could have returned to his home port with his cargo, and could have conferred with his owner and the shippers of the goods he had on board. In the case of The Julia Blake, 107 U. S. 427, 2 Sup. Ct. 692, speaking of the necessity under which the master is authorized to sell ship and cargo, and quoting from the former case of New England Ins. Co. v. The Sarah Ann, 13 Pet. 387, the court say:

"All will agree that the master must act in good faith, exercise his best discretion for the benefit of all concerned, and that it can only be done upon the compulsion of a necessity, to be determined in each case by the actual and impending peril to which the vessel is exposed."

The testimony, we think, shows a want of good faith on the part of the master in the matter of the disposition of his cargo. He seems to have sought to avoid the responsibility of his position, turning the goods over to Anderson, consular agent, to be disposed of under his order. The purser, the witness Commegere, says he opposed this; but, under the advice of the consular agent, Anderson, a cargo of bananas was taken, and paid for in part from the proceeds of the sale of the goods as stated by the witness Commegere, and the vessel cleared for New York. The conclusion is, we think, inevitable, from the testimony on this subject, that the master was at fault in the matter of the disposal of the goods shipped by the libelants, and that the case is one in which damages should be awarded. This brings us to the question of the measure of damages, which, it is insisted, is the value of the goods at the port of destination. If we are correct in the conclusion that the master was justified in not proceeding to and landing the goods at the ports of destination, according to the tenor and effect of the bills of lading, then we are of opinion that it devolved upon the master to either dispose of the goods in good faith, and to the best advantage, in the nearest ports which he was able to reach, or to return the goods to the shippers, with reasons for nondelivery. It is not shown that he did either. The bill of lading provides that, in the event of loss or nondelivery, the liability of the carrier is not to exceed the invoice value,—this to protect the carrier in ordinary cases where the goods are lost by some casualty. In view of the fact that the carrier might have relieved himself from responsibility by returning the goods to the shipper, and as the proof shows that in the port of shipment the goods were of the value specified in the invoice, we are of opinion that, under the peculiar facts of this case, no substantial injustice results to the carrier from following the rule of damages adopted by the district court, to wit, the

value of the goods as shown by the invoices at the port of shipment. We think the judgment of the court below should be affirmed, and it is so ordered.