## THE YARKAND.

(Circuit Court of Appeals, Fifth Circuit. March 3, 1903.)

No. 1,200.

1. SHIPPING—AUTHORITY OF MASTER TO SELL SHIP—NECESSITY.

The authority of a master to sell his ship is restricted within the narrowest limits, and will only be implied in case of actual and extreme necessity, and where he acts in the utmost good faith. It is his duty to advise the owners of an offer, and submit it to their decision, whenever it is practicable and feasible, notwithstanding the fact that he has previously notified them of the ship's peril, and has received no instructions; and only when the peril is so immediate and threatening that the necessary delay is not warranted will a sale by him be sustained.

2. SAME—VALIDITY OF SALE.

The Russian ship Yarkand stranded in the night on the coast of the Gulf of Mexico between Pensacola and Mobile Bay. The second day thereafter the master notified the owners by cable, and also the Russian vice consul at Pensacola. The latter, who was also agent for the insurers, at the master's request selected a competent board of survey, who visited and examined the vessel with him four days after she stranded. She was lying broadside on the beach, bedded in the sand, heavily listed, bilged, and with the water covering her 600 tons of ballast, and on a level with the sea outside, ebbing and flowing with the tide. Her crew had left her, and were camped on the shore for safety. The weather was rough and threatening. The board of survey reported that the peril of the ship was to her full extent, and so great as to demand immediate action; that, in their opinion, she could not be salved within a reasonable expense, and they recommended her sale if possible, fixing her value as she lay at $1,500. The master and vice consul concurred in their opinion, and, two days later, not having heard from the owners, the master sold her for $1,600, and gave a bill of sale. The insurers, to whom she had been abandoned by the owners, at once, on notice of her peril, brought action to recover her from the purchaser, who had floated and repaired her. *Held*, that under the circumstances the master had authority to make the sale, and that the purchaser acquired a valid title, there being no question of the master's good faith.

Appeal from the District Court of the United States for the Southern District of Alabama.

In Admiralty. Action by insurer to recover possession of a ship sold by the master while lying stranded.

For opinion below, see 117 Fed. 336.

In January, 1901, in the District Court of the United States for the Southern District of Alabama, the Marine Insurance Association of Finland, for itself and for other insurance companies, filed its libel against the Russian ship Yarkand, her tackle, apparel, furniture, and stores, and against all persons intervening for their interests therein. The libelant claimed that it, with the Second Marine Assurance Association of Finland and the Russian Company were the owners of the ship Yarkand, her tackle, etc., because of her abandonment to them by her owners; that the master had sold her to W. H. Northup without authority, and in fraud of the rights of libelant and all others interested in her; that he was in possession of the ship, claiming under a bill of sale given by the master. The ship, her tackle, etc., being seized to answer the libel, Northup, in conformity with a decree permitting it, gave bond for her appraised value to abide the final decree of the trial court or on appeal, and took possession of her.

In April, 1901, the Second Marine Assurance Association of Finland and the Russian Company came in as interveners or claimants, and adopted the alle-

gations made by the libelant. These latter companies will hereafter be spoken of as libelants.

The claimant, W. H. Northup, filed his answer, denying the lack of authority in the master to sell, and averring his authority under the existing circumstances, and alleging the good faith of the transaction. The case was tried before the district judge, and resulted in a decree sustaining the title of claimant, W. H. Northup, acquired by purchase from the master, and dismissing the libel. The libelants prosecuted this appeal from such decree.

On the night of December 29, 1900, the Russian ship Yarkand encountered stormy weather, and went aground off the beach about 18 miles easterly from Sand Island Light, near the entrance to Mobile Bay. At the time the ship was insured with libelants for a total of 100,000 Finnish marks. Her value afloat before the stranding was estimated by witnesses at from $15,000 to $30,000. On Monday evening, December 31st, the master of the ship, J. A. Saarni, advised the owners by cable of her stranding, and they, on January 3, 1901, abandoned her to the insurers, who, by formal letter of January 4th, accepted the abandonment. At this time D. C. Eitzen was agent of the Marine Insurance Association of Finland, and also Russian vice consul at the port of Pensacola. On December 31st the master had Eitzen advised by telegraph of the stranding of the Yarkand. Eitzen employed a tug at Pensacola, and repaired to the ship at once, arriving about 9 o'clock at night. He found the ship deserted, and the crew camped on the beach opposite. The reason for the crew leaving the ship is given in the testimony of the master Saarni, who was a witness for the libelants, as follows: "Q. Captain, why did you all leave the vessel, and go on shore? A. Well, that afternoon, or that night [December 30th], when we went on shore, it was very rough weather, and she was washing over, and the rigging was so much shaken and knocking we were afraid it would come down every moment. We couldn't stand on deck. Was knocked down many times by standing on deck, and the ship was hitting so much on the ground— Q. Pounding? A. Yes, sir; so long as she was empty, without water in her— Q. You were afraid she would go to pieces, and you would get drowned? A. The men came to me—came first to the mate—and said that they would not risk to be there that night on board, and the mate started to talk to me about the same, and I would not want the men to stay on board. I said to them, 'You can take some bedclothes, and something what you can, for to keep you warm, and go ashore, if you like.'"

The master requested Eitzen to return to Pensacola, and appoint a board of survey to make an inspection and survey of the ship at the earliest possible day. On January 1, 1901, Eitzen appointed as surveyors Sewell C. Cobb, surveyor for the American Bureau of Shipping, Capt. Jacob Kryger, surveyor for the National Board of Underwriters, and Robert H. Langford, ship carpenter and master builder. On that day they could not make the survey, as the weather was rough, and the sea so heavy as to prevent their boarding the Yarkand with safety. On January 2d they boarded the ship, and made a survey, which resulted in a report to Eitzen in part as follows: "We found the vessel (Yarkand) nine miles west of Perdido Inlet, apparently bilged in five feet of water, tide ebbing and flowing in her. Vessel has on board 600 tons of ballast, sand and rock, and we value her as she lies for $1,500.00. We do not think she can be floated within a reasonable expense, and therefore recommend that she be sold, and, if cannot be sold as she lies for $1,500.00, then we recommend that the master strip the vessel at once, in order to dispose of all material to the best advantage under the direction of the underwriter's agent, D. C. Eitzen." The master of the Yarkand went to Pensacola on the 2d day of January in company with the board of surveyors, and on the 4th of January, late in the afternoon, he executed a bill of sale for the ship to W. H. Northup for the sum of $1,600.

Judge Toulmin, before whom the case was tried, filed a full and exhaustive opinion, in which he reviews the contentions of the parties and the evidence. We quote from him at length, as follows:

"The ship was subsequently gotten off the beach, and towed to Pensacola, and converted into a barge. Her value was variously estimated by the witnesses, some of whom had seen her after the survey and before she was gotten off the beach. They differed widely in their opinions of her value,.

both as she was lying on the beach and if she were afloat and in repair. On January 5th, the day after the sale, another survey was had, by appointment of the Russian vice consul, at the port of Mobile. The surveyors, in their report, described the situation of the ship, expressed the opinion that she could be salved at an expense that would justify the effort to save her, and recommended that the effort be made. It is contended on the part of the libelants that the master had no authority to sell the ship; that there was no necessity for it; that the master was unwilling to make such sale, but was urged by said Eitzen and others to immediately sell her at private sale; and that, yielding to their importunities, he accordingly executed the bill of sale. It is further contended that the consideration was grossly inadequate, and that the sale was fraudulent and void. It is contended by the claimant that, while the master had no express authority to sell the ship, he acted under his implied authority as master, and was justified in doing so by the circumstances of the case.

"Two of the three surveyors appointed by the Russian vice consul, Eitzen, testified in the case with intelligence and clearness and in detail as to the situation of the vessel, and why they considered her in great peril and of little value as she lay on the beach. They were shown to have had large experience in such matters, and to have been entirely disinterested. It appeared that the third surveyor had died since the survey, but he, too, was shown to be thoroughly competent and experienced, and as having fully concurred in the views expressed by his colleagues. The testimony of the two surveyors who were witnesses in the case was, in substance, that the ship was lying almost broadside on the beach, and bedded about nine feet in the sand, and heavily listed off and towards the shore, with water in her up to tide-water mark, and with five feet of water at the stern. The sea was breaking against her side. The crew had left her, and were camped on the shore. She was bilged, and water ebbing and flowing in her, the water being the same height in the vessel as on the outside. The ship was at the time lying still, but the water in her was washing even with and the same as the water on the outside of her. Her position was a very hazardous one, and, in their opinion, her peril was to her full extent; that she was too badly bilged ever to be gotten off, and they believed she could never be gotten off. There were fish of considerable size swimming in the water in the vessel, which indicated that there was quite a large hole in her bottom. They could not examine the vessel below the water line. She had about 600 tons of ballast in her, and the water covered the ballast. There was every indication of a gale of wind, and they then believed the vessel was in danger of capsizing and being pounded to pieces.

"The master of the ship testified on the part of the libelants, and, among other things, said: That his ship went aground on December 29, 1900, at night, and on December 31st he sent a cable to the owners of the ship and a telegram to the Russian vice consul, Eitzen, telling them the condition of the ship, and that the same was full of water. That there was water in her hold as high as there was on the outside of her. He saw that the deck was a little bent amidship upward, and the pitch from the seams broken. He could not see that she was started anywhere else. That the crew left the ship, and camped on the shore. He further stated: That the ship was sold on January 4th, some time about 6 o'clock in the evening. That he understood it was to Saunders & Co. That he got this understanding from Eitzen, who made the trade for the sale. He did not talk with anybody else about the sale of the ship except Eitzen. A few hours before the sale Eitzen told him he could get the full sum at which the ship was valued by the surveyors, and he thought it a good bargain. That he signed the bill of sale about 6 o'clock, January 4th. Did not know W. H. Northup, and does not know whether he was present when the bill of sale was signed. There were several persons present, but he did not know who they were. That Eitzen told him he was representing the underwriters, and had authority from them to sell the ship. That Eitzen said 'in such cases as that, nothing else could be done except to sell the ship, and that he got the power from them, or something of that kind.' That what witness understood Eitzen to mean was that in such a case there was nothing else could be done except to sell the ship. Witness

received a part of the purchase money, and left the balance with R. A. Hyer, the ship's agent, to pay her bills. He requested Eitzen to bring the surveyors aboard to examine the vessel, and Eitzen came with them. Witness received no directions from the owners of the ship, and no answer at all to his cable. He further stated that he was trying to do the best he could for the underwriters and for the owners, and he believed at the time he signed the bill of sale that he was doing the best for all concerned; that he agreed in opinion with the surveyors that the ship was in danger of being lost, and that he would not have signed the bill of sale if he had not had that opinion.

"W. H. Northup testified for claimant: That he was the purchaser of the ship; that he and the master negotiated the trade for her. That they had several interviews on the subject before the trade was finally consummated in Eitzen's office. They met there by previous agreement. That Eitzen was present in his office at the time, but took no special part in the transaction. Eitzen had some conversation with the master there, but did not make the trade with witness, or have any negotiations with him about it further than to ask him on the same day, and before he had seen the master on the subject, if he could not do something towards helping the master out in the sale of the ship. Eitzen's testimony on this point was substantially the same as that of witness Northup. He further stated that about noon on the day of the sale R. A. Hyer said to him that Northup or Saunders would give $1,600 for the ship. That he told Hyer the master must be seen about it, and he would bring them together; that later on that day Northup and the master did meet at his office, and that they dealt directly together; that witness said to the master that he thought he made a good bargain, and that it was the best thing that could be done, in which the master fully agreed. Witness stated that he saw the ship on the beach at least twice between the time she stranded and the day of the sale, and that his opinion, as a seafaring man of considerable experience, was at the time that she could not be saved, and would become a total loss; that he had no interest in the purchase of the ship.

"B. C. Tunison testified that he was an attorney at law, and prepared the bill of sale at the request of the purchaser, and he was present at the signing of it by the master, and was a witness to his signature. He stated that the master expressed to him satisfaction at having closed the trade, and reiterated several times after the sale that the ship was in imminent danger, and he believed her bottom was out, and that she could not be gotten off. He said 'he had the $1,600 and the purchaser the ship with the bottom out.' There was evidence that tended to show that one Saunders was interested with Northup in the purchase of the ship.

"Communication with the owners was practicable, if not very easy. It could be had by cable, and it appears that on December 31, 1900, the second day after the accident, the master gave notice by cable of the stranding of the ship. The proof was that an answer by cable could be had, and ordinarily was had, in from 16 to 24 hours, at the outside, between Pensacola, Fla., whence the master's telegram was sent, and Abo, Finland, the residence of the owners, to which it was sent. The proof further was that the master received no directions, in fact no answer of any sort, from the owners."

The Yarkand (D. C.) 117 Fed. 336.

It also appears from the evidence that pieces of clay ballast were washed ashore.

Jno. C. Avery, W. H. McIntosh, and Jos. C. Rich, for appellants.
Gregory L. Smith and Harry T. Smith, for appellee.

Before PARDEE and SHELBY, Circuit Judges, and MEEK, District Judge.

MEEK, District Judge, after stating the facts as above, delivered the opinion of the court.

The appellants complain that the trial court erred in holding as matter of law on the facts found that there existed such a necessity

as justified the master in selling the ship without first communicating with and securing the authority of the owners. They do not challenge the correctness of the facts found by the district judge, but by the phrasing of the assignment of errors and in their argument and briefs they tacitly admit the sufficiency of the evidence to support his findings. We have read the record carefully, and have concluded that, though the testimony as to the condition and peril of the ship is conflicting, yet it sustains the findings of the district judge, and, consequently, they will not be disturbed. The Albany (C. C.) 48 Fed. 565; The Alijandro, 6 C. C. A. 54, 56 Fed. 622.

The principles involved in the disposition of this case are few, and well settled. Both sides to the controversy cite the same authorities in support of their respective contentions, so that it is manifest the difficulty lies in the application of recognized principles to the facts. It is settled law that a master has no general authority, virtute officii, to sell his vessel. The Catherine, 15 Jur. 1 Eng. Law & Eq. 679; Gates v. Thompson, 57 Me. 422, 99 Am. Dec. 782; 20 A. & E. of Law, Second Ed. 210. It is as well settled that a master has implied authority to sell his vessel in case of actual necessity; but there must be an extreme necessity, and the master must have acted in good faith, to render the sale made by him valid. The Amelie, 6 Wall. 26, 18 L. Ed. 806; The Brig Sarah Ann, 2 Sumn. 206, Fed. Cas. No. 12,342; Id., 13 Pet. 400, 10 L. Ed. 213. Mr. Justice Davis, in The Amelie, cited supra, says:

"The sale of a ship becomes a necessity, within the meaning of the commercial law, when nothing better can be done for the owner, or those concerned in the adventure. If the master, on his part, has an honest purpose to serve those who are interested in the ship and cargo, and can clearly prove that the condition of his vessel required him to sell, then he is justified. As the power is liable to abuse, it must be exercised in the most perfect good faith, and it is the duty of courts and juries to watch with great care the conduct of the master. In order to justify the sale, good faith in making it and the necessity for it must both concur, and the purchaser, to protect his title, must be able to show their concurrence. The question is not whether it is expedient to break up a voyage and sell the ship, but whether there was a legal necessity to do it. If this can be shown, the master is justified; otherwise not. And this necessity is a question of fact to be determined in each case by the circumstances in which the master is placed, and the perils to which the property is exposed."

The good faith of the master in selling the ship is not questioned. It is manifest from his conduct that he had an honest purpose to serve those at interest, and that he was exercising his best discretion. But this is not sufficient. The claimant must also show that the sale of the ship was an actual and pressing necessity; that her condition was truly perilous, menacing the owners with a total loss, or subjecting them to such burden of expense in any attempt to deliver her as not to justify the undertaking. The ship was stranded on the beach, and exposed to the wind and waves of the Gulf of Mexico. She was lying almost broadside, and had 600 tons of ballast in her hold. She was heavily listed off and towards the shore, and was bilged, but by reason of the ballast and water in her it could not be ascertained how badly. The water covered the ballast

at the same height or level within the ship as in the Gulf, and the tide ebbed and flowed in her. Large fish were swimming in the hold, and pieces of clay ballast had washed ashore. The weather on the Gulf was rough and threatening. Competent and disinterested surveyors, after making such an examination as conditions would permit, concluded that the peril of the ship was "to her full extent," and so great as to demand immediate action on the part of the master in disposing of her. With the plainly perilous condition of the ship before him, and his own judgment re-enforced by the recommendation of the board of surveyors, the master was justified in making a sale, in event it was not practicable or feasible for him to consult the owners in order that they might determine and direct the course to be pursued.

Mr. Justice Davis, in The Amelie, cited supra, further says:

"If the master can, within a reasonable time, consult the owners, he is required to do it, because they should have an opportunity to decide whether, in their judgment, a sale is made necessary."

In Hall v. Franklin Insurance Company, 9 Pick. 466, Judge Putnam says:

"The master acts for the owners or insurers because they cannot have an opportunity to act for themselves. If the property could be kept safely until they could be consulted, and have an opportunity in a reasonable time to exercise their own judgment in regard to the sale, the necessity to act for them would cease."

The master cabled the owners of the stranding of the ship and her peril on December 31, 1900. The sale was not made until the afternoon of January 4, 1901. The intervening time was occupied by the master in securing a board of surveyors to pass upon the condition of his vessel, in receiving its report, and finding a purchaser. The owners did not communicate with him upon receipt of his cable, but straightway abandoned the ship to the insurers. The insurers had not advised or given him any directions up to the hour of sale. The learned district judge expresses the rule he considers applicable to these facts as follows:

"If notice to the owners was not easy and practicable, or, if given, and the master had failed to ascertain their wishes within a reasonable time, then he was authorized to act upon the necessity and emergency of the occasion as they then appeared to him from all the lights before him."

We do not consider that the failure of the owners or insurers to communicate their wishes within a reasonable time would enlarge the authority of the master in the premises. Such a rule, in our opinion, would alter the manifest and wise tendency of the law to restrict his authority to sell to the narrowest limits. Where it is feasible, the owners should always have the right to say what disposition shall be made of their property, and their rights should be safeguarded by all possible and reasonable rules. If it had been practicable and feasible for the master to communicate the offer made him for the purchase of the ship to the owners, it would have been his duty to do so, even though he had advised them of the ship's stranding and peril, and had received no instructions from them as to what to do. He could only be justified in a failure to

communicate the offer because at the time it was made the peril of his ship was so great and so impending and immediate in character as not to warrant the necessary delay. The facts of this case relating to the perilous condition of the ship, in our opinion, bring it within the rule enunciated, and so we conclude that the master was justified in making the sale without first communicating with the owners.

The part taken by the vice consul, Eitzen, in the transactions ending in the sale of the ship, is severely criticised by the appellants, and it is charged that the master did not exercise his own discretion and judgment in making the sale, but was unduly influenced thereto by Eitzen. The vice consul was active in effecting the sale, but a careful and impartial review of the testimony of the master discloses that he was impressed with the necessity of the sale by reason of the ship's condition and imminent peril, and that he acted primarily upon his own judgment and the recommendations of the board of surveyors. Eitzen gave his opinion as to the advisability of the sale, but it would have been strange had he not done so. However, it is the master's good faith that is material to this inquiry, and, his good faith not being questioned, it is unnecessary to further analyze or discuss the conduct of Eitzen.

That the ship was subsequently floated is urged by counsel for the appellants as being a fact material in reaching a correct conclusion, especially in view of the number of witnesses who testified the ship was in no immediate peril. The justification of the master is to be found in the condition and circumstances which confronted him at the time of the sale. The witnesses testified after the event, and, while they may not have been consciously influenced by the fact that the ship withstood its peril, yet their convictions were no doubt heightened and strengthened thereby. Each day the ship lived through its peril would naturally inspire added confidence of its ultimate rescue. The subsequent floating of the ship demonstrates the master and his advisers indulged an erroneous judgment, but elements over which man has no control, and that he cannot forecast, so enter into an order the ultimate event that it would be unjust to raise up a presumption of incompetence against honest and experienced men because of such erroneous judgment, and the law does not do it. The Brig Sarah Ann, 13 Pet. 387, 10 L. Ed. 213; The Amelie, 6 Wall. 18, 18 L. Ed. 806.

The decree of the District Court is affirmed.